STATE OF CONNECTICUT *v.* RICHARD PELLEGRINO
(9958)

SPEZIALE, C. J., PETERS, PARSKEY, SHEA and GRILLO, Js.

---

Argued June 12—decision released August 21, 1984

*Temmy A. Pieszak,* with whom was *Joette Katz,* for the appellant (defendant).

*Donald A. Browne,* state's attorney, with whom, on the brief, was *Dominick J. Galluzzo,* assistant state's attorney, for the appellee (state).

SHEA, J. The defendant, Richard Pellegrino, was charged with committing manslaughter in the first degree[1] by causing the death of Ronald Memoli, and

---

[1] At the time of the offense, General Statutes § 53a-55 (a) (3) provided that: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

arson in the first degree[2] by starting a fire with the intent to destroy a building while aware that Memoli[3] was inside the building. A jury found him guilty of both crimes and the court rendered judgment in accordance with the verdicts. In his appeal the defendant raises four claims of error, maintaining: (1) that the term "another person" as used in General Statutes (Rev. to 1977) § 53a-111 was not intended to include an accomplice to the arson;[4] (2) that the court erred in concluding that the defendant had waived his right to remain silent when, while under arrest, he responded to statements made by a police officer; (3) that the prosecutor improperly commented upon the fact that the defendant had refused to talk to the police; and (4) that the evidence was insufficient to establish his guilt beyond a reasonable doubt. We find error only in the improper comment of the prosecutor. Accordingly, we order a new trial.

---

[2] At the time of the offense, General Statutes (Rev. to 1977) § 53a-111 provided that: "(a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, he starts a fire or causes an explosion, and (1) at the time, another person is present in such building or is so close to such building as to be in substantially the same danger as a person in such building would be, and (2) the actor is either aware that a person is present in or close to such building, or his conduct manifests an indifference as to whether a person is present in or close to such building."

[3] The information charged that Pellegrino had started a fire with the intent to destroy a building "aware that a person was present in such building." At trial the jury was instructed that the person was Memoli.

[4] In his original brief, the defendant claimed that the General Assembly did not intend to hold him criminally responsible for manslaughter for his accomplice's death. Still later, in the section of his brief focusing on the same issue, the defendant maintained that the evidence was insufficient to establish that he caused Memoli's death. In his reply brief, the defendant conceded that "under § 53a-55 (a) (3) where the State can properly prove causation, 'a defendant has the same criminal responsibility for the death of his accomplice as he would for any other individual.' " It appears, therefore, that the defendant no longer contests that he could be charged with manslaughter; rather, he maintains that the evidence was insufficient to establish beyond a reasonable doubt that he caused Memoli's death.

From the evidence presented at trial and inferences drawn therefrom, the jury could have reasonably found the following facts: On March 13, 1978, at approximately 11:50 p.m., the defendant Pellegrino attempted to call Ronald Memoli at Memoli's sister's house where Memoli was living. Doreen Koellisch, Memoli's sister, answered the phone and, after a brief conversation with the defendant, requested that he call back on another phone. Shortly thereafter, the defendant called back on the kitchen phone and spoke briefly with Memoli. After concluding the conversation, Memoli told his sister that the defendant was coming to pick him up because they had to go out. The defendant arrived driving a Lincoln Continental. He was accompanied by two individuals unknown to Koellisch. All four drove off together shortly thereafter.

At approximately 3 a.m. on March 14, 1978, an explosion occurred at the Dolphin Fish Market located at 315 Wood Avenue in Bridgeport. A fire broke out and completely destroyed a five store shopping complex located on the avenue. An adjacent dwelling and two automobiles, all located on Elmwood Avenue, were also damaged. A resident of one of the Elmwood apartments was thrown from her bed as a result of the explosion, and in a panic she and her daughter fled the apartment. Before she left her apartment, however, the women heard tires squealing as a car left the scene of the fire.

Firemen who were attempting to extinguish the blaze discovered inside the fish market three five gallon cans which had contained a petroleum distillate. From this and other evidence the chief and deputy chief of the fire department concluded that the fire was of incendiary origin.

At approximately 4 a.m., Frances Trapani, Pellegrino's neighbor, received a call from the defendant's girlfriend

requesting her to babysit while the girlfriend drove the defendant to St. Vincent's Hospital. When Trapani arrived at the Pellegrino home she noticed that the defendant's face was swollen and that he was changing into another pair of blue jeans. The pants that he had been wearing were burned in the rear. The defendant arrived at St. Vincent's shortly thereafter, where he was treated for facial and body burns.

That same day, at approximately 11 a.m., the police responded to a call for emergency assistance from a house located on Fairfield Beach Road. Upon arriving an officer noticed a Lincoln Continental parked in front of the house. Leonard Hainsworth,[5] who was then using the alias Sam Gordon, was found inside. He was suffering from first and second degree burns that he said had resulted from an oil burner explosion in Stamford. No one had reported this event, however, to the Stamford fire or police department. Hainsworth was eventually transported to Bridgeport Hospital where he was treated for his injuries.

On March 17, 1978, members of the police or fire departments were sifting through the rubble at the fish market when, at a spot close to where the gasoline cans had been discovered, they found the remains of a person later identified as Memoli. A pathologist who examined the corpse was of the opinion that Memoli died in the fire.

I

In his first claim of error the defendant maintains that General Statutes (Rev. to 1977) § 53a-111[6] was not intended to cover situations where an arsonist burns

---

[5] Hainsworth was charged as a codefendant and pled guilty midway through trial.

[6] This statute was subsequently amended in 1979; see Public Acts 1979, No. 79-570; and in 1980. See Public Acts 1980, No. 80-229, Public Acts 1982, No. 82-290.

a building while aware that a coparticipant is within the building. The defendant maintains that when the General Assembly used the term "another person," it meant other than one who "starts a fire or causes an explosion." He claims that because the evidence demonstrated that Memoli was an accomplice[7] and, therefore, was one who started a fire or caused an explosion, he was not "another person" as required by the statute. The defendant argues that any other construction of the statute would be an unconstitutional judicial expansion, violating the principles set forth in *Bouie* v. *Columbia,* 378 U.S. 347, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964).[8]

A cardinal rule of statutory construction is that where the words of a statute are plain and unambiguous the intent of the General Assembly in enacting the statute is to be derived from the words used. See *State* v. *Smith,* 194 Conn. 213, 221, 479 A.2d 814 (1984); *McDonald* v. *Haynes Medical Laboratory, Inc.,* 192 Conn. 327, 334, 471 A.2d 646 (1984); *P. X. Restaurant, Inc.* v. *Windsor,* 189 Conn. 153, 159, 454 A.2d 1258 (1983). A corollary rule is that the words of a statute are to be construed with common sense and "according to the commonly approved usage of the language." General Statutes § 1-1; *State* v. *Belton,* 190 Conn. 496, 506, 461 A.2d 973 (1983); *State* v. *Roque,* 190 Conn. 143, 151, 460 A.2d 26 (1983).

When construed in a common sense fashion, it is clear that the phrase "another person," as used in § 53a-111 refers to one other than the person charged with the crime. See *State* v. *Smith, supra.* If we were to adopt

---

[7] The state does not dispute this claim.

[8] None of these claims was raised at trial. Nevertheless, because they implicate a fundamental principle of constitutional law, that the evidence presented at trial establish beyond a reasonable doubt that the defendant committed acts that are unlawful, we will address them. See *State* v. *Burney,* 189 Conn. 321, 324–25, 455 A.2d 1335 (1983).

the defendant's construction of the statute, we would be creating an exception that would not otherwise exist, i.e., that the other person present in or near the building cannot be the defendant's accomplice. It is noteworthy that the General Assembly has expressly provided such an exception in the felony murder statute. See General Statutes § 53a-54c.[9] The absence of a similar provision in § 53a-111 (Rev. to 1977) strongly suggests that such an exception was not intended by the General Assembly. We construe § 53a-111 (Rev. to 1977) to include situations where the defendant burns a building with the intent to destroy it while aware that an accomplice is in or near the building.

Nor do we find our construction of the statute to be "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie* v. *Columbia,* supra, 352. In *Bouie,* the Supreme Court struck down the petitioner's conviction for trespassing where the state supreme court had expanded the trespassing statute to include the prohibited conduct of "remaining on the premises of another after receiving notice to leave." Id., 350. The applicable statute provided only that it was unlawful to " '[enter] upon the lands of another . . . after notice from the owner or tenant prohibiting such entry . . . .' " Id., 349–50. The state supreme court's construction was not a fore-

---

[9] The New York statute upon which General Statutes § 53a-111 was modeled, N.Y. Penal Law § 155.15 (McKinney 1965), was amended after the Connecticut Commission to Revise Criminal Statutes submitted its comments on the proposed legislation. See Report of the Commission to Revise the Criminal Statutes (1965). The New York statute now expressly provides that a coparticipant is not "another person" as used in the statute. See N.Y. Penal Law § 150.20 (McKinney 1983). This modification suggests that the New York General Assembly considered its previous arson statute, the one upon which § 53a-111 (Rev. to 1977) was modeled, to encompass situations where a defendant burned a building while aware that a coparticipant was in the building.

seeable extension of prior law,[10] and, therefore, gave no fair warning to the petitioners that their conduct was unlawful. Id., 350.

Unlike the statute at issue in *Bouie,* § 53a-111 gave substantial warning that a defendant would be engaging in an unlawful act if he burned a building with the intent to destroy it, aware that any person, whether or not an accomplice, was inside or close to the building. The language expressly provides that it is unlawful to burn a building with the intent to destroy it "and . . . the actor is either aware that a person is present in or close to such building, or his conduct manifests an indifference as to whether a person is present in or close to such building." The statutory language does not exclude any specific categories of "persons." Absent such an exclusion, the defendant was fairly apprised that his accomplice was a "person" as that term is used in the statute.

## II

The defendant's second claim of error concerns the trial court's ruling on the defendant's motion to suppress statements he made to a Bridgeport police officer. The defendant claims that the statements were made without a voluntary, intelligent and knowing waiver of his *Miranda*[11] rights. The factual underpinnings of this claim are as follows: After the defendant was taken to St. Vincent's Hospital, he was admitted and treated for burns on his face and hands. In order

---

[10] Justice Brennan, writing for the majority, stated: "in the 95 years between the enactment of the statute in 1866 and the 1961 decision [relied upon by the state supreme court], the South Carolina cases construing the statute uniformly emphasized the notice-before-entry requirement, and gave not the slightest indication that that requirement could be satisfied by proof of the different act of remaining on the land after being told to leave." *Bouie* v. *Columbia,* 378 U.S. 347, 356–57, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964).

[11] *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

to alleviate Pellegrino's pain, a doctor prescribed eight milligrams of morphine, which was administered several times per day.[12]

On March 17, 1978, three days after the fire at the fish market, the defendant, still recovering from his burns, was placed under arrest by officer Anthony P. Fabrizi. Fabrizi informed Pellegrino of his rights,[13] and then told Pellegrino, "obviously you have gotten yourself hurt. You are just a tool. You were the means to an end. You're being used. And you're going to take the fall on manslaughter and arson in the first degree. And you know we're not really interested in you; I want the man that contracted the job." The defendant responded that he knew what Fabrizi wanted. He also stated that "[he] can't do any more time." He then told Fabrizi that he would speak to his lawyer and then get back in touch with Fabrizi.[14]

At the hearing on the motion to suppress, a physician testified that morphine had the effect of impairing a person's motor skills.[15] A hospital report indicating

---

[12] For example, on March 15, 1978, Pellegrino was given seven shots; on March 16, he received five shots and one shot of chloral hydrate, a sedative. On March 17, he received five shots of morphine, but no chloral hydrate.

[13] At the hearing on this motion, the defendant's brother, Anthony Pellegrino, maintained that he was in the room when Fabrizi arrested Pellegrino, and that Fabrizi never read the defendant his rights. In his appellate brief, however, the defendant acknowledges that the trial court was entitled to reject this evidence.

[14] Fabrizi testified at the hearing on the motion to suppress that Pellegrino had stated that he was in too much pain to talk. Fabrizi also stated, however, that Pellegrino wanted to talk to his lawyer before continuing his conversation with Fabrizi.

[15] "The witness: The medication usually does not render you inappropriate in the sense that you are unconscious or in a coma or that you can't respond. It does not generally make it so that you are not able to do basic things like put on your clothes.

"The court: How about comprehension?

"The witness: That is a different matter altogether. Okay. And I think depending on the dose you get it does interfere with certain activities such as driving a car, running a machine. Generally in practice if you're going

that the defendant was "oriented, alert" four hours after he was placed under arrest was also admitted into evidence. Relying in part upon the expert's testimony and the hospital report, the trial court concluded that Pellegrino had voluntarily and knowingly waived his right to remain silent. The motion to suppress[16] was denied.

"The admissibility of the defendant's confession under these circumstances is governed by well-established principles. In order to prove that the defendant has effectively waived his privilege against self-incrimination, the state must prove, by a preponderance of the evidence . . . that the defendant knowingly and intelligently waived his constitutional right to remain silent. . . . Waiver is not conclusively established by demonstrating that *Miranda* warnings were given and understood. . . . Nor is it conclusively rebutted by refusal to sign a form waiving *Miranda* rights . . . nor by refusal to sign a written statement in the absence of legal counsel. . . . In the absence of an express waiver, the state bears the heavy burden of demonstrating, as a matter of fact, that 'waiver can be clearly inferred from the actions and words of the person interrogated.' . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascer-

---

to give a medication of this type, although you generally don't give morphine to a person who is going to be outside of the hospital setting because it is only given intramuscularly or intravenously, you advise him not to do certain things like drive, not to run a machine, not to get into a situation where you have to be alert and able to react quickly.

"The court: You're talking about cycle motor, aren't you?

"The witness: Yes.

"The court: Motor reaction.

"The witness: Yes, you are."

[16] The court did suppress statements made to another police officer. This ruling, however, was based upon that officer's failure to advise Pellegrino of his *Miranda* rights before engaging Pellegrino in the conversation.

tain whether such a factual finding is supported by substantial evidence. . . ." *State* v. *Harris,* 188 Conn. 574, 579–80, 452 A.2d 634 (1982).

Upon our independent review of the facts adduced at the hearing on the motion to suppress, we conclude that the trial court did not err in denying the motion to suppress. At the outset we note that this case is quite similar to *State* v. *Harris,* supra, where we found no *Miranda* violation, in one respect: the defendant never testified at the hearing that he did not understand the warnings or was unfamiliar with criminal proceedings.[17] The only issue presented to the trial court was whether the medication taken prevented the defendant from comprehending his rights and voluntarily and knowingly relinquishing them. The medical expert's testimony amply supported the court's conclusion that the morphine had not impaired the defendant's ability to comprehend his rights. Moreover, the court was justified in concluding that the very fact that the defendant invoked his sixth amendment right to counsel after he had spoken briefly with Fabrizi indicated that the defendant was aware of his rights and voluntarily waived them up until that point. Unlike *State* v. *Wilson,* 183 Conn. 280, 439 A.2d 330 (1981), a case upon which the defendant relies, there is evidence here that the defendant was aware of his right and voluntarily relinquished it. We find no error with respect to this issue.

## III

In his third claim of error, the defendant maintains that the prosecuting attorney improperly brought to the attention of the jury the fact that the defendant

---

[17] What we stated in *State* v. *Harris,* 188 Conn. 574, 581, 452 A.2d 634 (1982), is applicable here: "While the defendant had no obligation to testify himself or to offer testimony, a court cannot supply evidence that is lacking. *United States* v. *Frazier,* 476 F.2d 891, 897 (D.C. Cir. 1973); *United States* v. *Hayes,* 385 F.2d 375, 378 (4th Cir. 1967), cert. denied, 390 U.S. 1006, 88 S. Ct. 1250, 20 L. Ed. 2d 106 (1968)."

had exercised his fifth amendment right to remain silent. Specifically, the defendant maintains that the prosecutor acted with intent to impeach the defendant's in-court testimony and, therefore, violated his due process rights.[18] See *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). In order to address this issue properly, we must set forth the proceedings at trial out of which it arose.

At trial the state called officer Fabrizi to the stand. He testified before the jury as follows: "Upon completion of the Miranda warnings I said to him, Richard, you're in a lot of trouble. There is a boy dead as a result of this fire and we feel we have enough to arrest you for the fire and your friend up in Bridgeport Hospital. Richard said to me, he said, I can't do any more time. I said, I want you to think about this. I am not here to question you today. His discomfort was obvious. I said, we will talk again. And he said to me, I will talk to my lawyer and I will get back to you."

Thereafter, the defendant took the stand and testified that after Memoli had been picked up they rode around for a short while. Memoli then asked the defendant for some of the wages owed to him.[19] The defendant gave Memoli fifty dollars, and Memoli was dropped off about four blocks from his sister's house. Shortly thereafter, the defendant was dropped off at his own house.

The defendant further testified that at approximately 3:30 a.m., he received a phone call from two people to whom he owed $10,000. They made demands for their money and, in order to allay his own fears of retribu-

---

[18] Although this claim of error was not raised at trial, we have recently indicated that the claim of error is reviewable under the second prong of the "exceptional circumstances" doctrine. See *State* v. *Reid,* 193 Conn. 646, 652–53, 480 A.2d 463 (1984).

[19] Memoli was employed by Pellegrino in Pellegrino's refuse hauling business.

tion, the defendant drove to an intersection popularly known as "Five Corners," to meet with his "creditors." He testified that shortly after he arrived an argument ensued. He claimed that his two creditors threw a flammable liquid at him and started him on fire, causing his burns.[20]

Thereafter, the defendant's brother, Lawrence Pellegrino, testified that in May, 1979, while he was working at a bar his wife owned, he was approached by three men. He claimed that they began to beat him up and, in the course of the fight, one of them stated, "Richard, we owe you this."

Thereafter, during closing argument, the prosecutor commented upon the testimony of the defendant Richard Pellegrino, stating: "I think one important point to bring out concerning the testimony of Mr. Pellegrino at this time concerns his statements with respect to Inspector Fabrizi. Inspector Fabrizi had indicated to him that, indicated to us that, I guess, the main thrust of his talking to Richard at that time was the information he received from Mr. Pellegrino was the fact, I don't want to talk to you. I don't want to do any more time. And I think that really came to focus when Mr. Pellegrino took the stand and indicated that in March 1978 he had seven years hanging over his head on parole."

When reviewing claims of improper comment upon the defendant's exercise of his right to remain silent, we have stated that, " '[w]hen there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is

---

[20] Testimony was presented establishing that the police had found no evidence of a fire at the Madison School on Wayne Street. The defendant claimed, however, that the incident occurred five blocks south of the Madison School on Wayne Street.

transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error.' *Chapman* v. *United States,* 547 F.2d 1240, 1250 (5th Cir.), cert. denied, 431 U.S. 908, 97 S. Ct. 1705, 52 L. Ed. 2d 393 (1977); *Leake* v. *Cox,* 432 F.2d 982, 984 (4th Cir. 1970). The rule has similarly been applied where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the 'jugular' of the defendant's story. *United States* v. *Davis,* [546 F.2d 583, 594 (5th Cir. 1977)]; see *United States* v. *Harp,* 536 F.2d 601, 603 (5th Cir. 1976)." *State* v. *Zeko,* 177 Conn. 545, 555, 418 A.2d 917 (1979); see also *Williams* v. *Zahradnick,* 632 F.2d 353, 361–62 (4th Cir. 1980).

Although it is a close question as to whether the two instances of improper comment mentioned above amount to harmful error,[21] we find it unnecessary to address that issue. In our own independent examination of the record, we have discovered a third instance of improper comment that decidedly tips the balance and requires us to set aside the defendant's conviction and order a new trial. In his rebuttal, the prosecutor again commented upon the defendant's testimony, stating: "[n]ow we start talking about the quality of evidence. Now we start talking about if there are two stories. And they are both given equal weight. Then you have to give the benefit to the defendant. But when you have an incredible story on one side and another story that smacks with the truth, it is a decision you're going to have to make. He [the defendant] borrows money from a motorcycle club, $10,000.00 in cash with no interest. He never paid it back. Other than the pos-

---

[21] In fact, it is doubtful that Inspector Fabrizi's testimony qualifies as comment upon the defendant's exercise of his right to an attorney. See *United States* v. *Whitaker,* 592 F.2d 826, 830–31 (5th Cir. 1979), cert. denied, 444 U.S. 950, 100 S. Ct. 422, 62 L. Ed. 2d 320 (1980).

sibility that Richie might have been mistaken for his brother a year later in a bar and a scuffle ensued, the money was never paid back. I will take care of it myself. *Never told the police that it was Pirate and Danny whom he doesn't know the last names of.* But he is going to take care of it himself. Is this the type of story that is consistent as Mr. Winter claims Pellegrino's story is consistent in every way? I suggest it is no story at all. Is it as plausible and logical as Mr. Winter suggested? I say no. Is it a courageous act for him *to come into court now, come to court and tell us that story?"* (Emphasis added.) The statement "[n]ever told the police that it was Pirate and Danny," is a clear reference to the fact that the defendant never spoke with the police after he invoked his right to consult with an attorney.

In the present case there were at least three instances where the prosecutor informed the jury that the defendant had exercised his right to remain silent. Twice during the state's argument this fact was highlighted and the jurors were left to draw an unfavorable inference from the defendant's decision to remain silent. The factual issues in this case were very narrowly drawn: Did the defendant burn himself while starting the fire at the fish market, or were the burns inflicted upon the defendant by two disgruntled assailants? The latter claim was the heart of the defense. And, by implying that the jury should draw an unfavorable inference from the defendant's decision to remain silent at the time of his encounter with the police, the prosecutor struck an improper blow. "[C]omment upon the silence of the accused as a prosecutorial technique is often a crooked knife, and one likely to turn in the prosecutor's hand. The infusion of 'harmlessness' into error must be the exception, applicable in circumstances few and discrete, and to be sparingly employed." *State* v. *Zeko,* 177 Conn. 545, 558, 418 A.2d 917 (1979).

## IV

In his final claim of error the defendant maintains that there was insufficient evidence to establish his guilt of either crime charged beyond a reasonable doubt. Although we have ordered a new trial, "we must also address this claim, because if we were to rule that the evidence was insufficient, the defendant would be entitled to an acquittal rather than a new trial. *Burks* v. *United States,* 437 U.S. 1, 18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978)." *State* v. *Ferrell,* 191 Conn. 37, 46, 463 A.2d 573 (1983). " 'In determining whether the evidence is sufficient to sustain a verdict, "the issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt." . . . .' (Citations ommitted.) *State* v. *Giguere,* 184 Conn. 400, 402–403, 439 A.2d 1040 (1981); see also *Jackson* v. *Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979)." *State* v. *Reid,* 193 Conn. 646, 666, 480 A.2d 463 (1984). In reviewing the evidence, we must construe it in a light most favorable to sustaining the verdict. *State* v. *Ferrell,* supra.

## A

We find that the jury could have reasonably concluded that the defendant was guilty of manslaughter in the first degree in violation of § 53a-55 (3). There was substantial evidence to establish the requisite "circumstances evincing an extreme indifference to human life." The fire was started with an accelerant that caused an explosion, burned completely a five-story shopping complex, and scorched a nearby residential building. From this and other evidence the jury could

have reasonably concluded that the defendant cared little for the lives of those dwelling in the building nearby when he set the fish market on fire. Similarly, the jury could have concluded from the size of the fire and the damage it caused that the defendant "engage[d] in conduct which create[d] a grave risk of death to another person," including other participants in the criminal endeavor.

The defendant maintains, however, that the state did not prove beyond a reasonable doubt that he caused Memoli's death. He points to cases from several other jurisdictions that have applied a causation theory to limit the criminal liability of a defendant for the death of his accomplice. See, e.g., *State* v. *Light,* 577 S.W.2d 134 (Mo. App. 1979) (manslaughter conviction) overruled by *State* v. *Baker,* 607 S.W.2d 153 (Mo. 1980); *Woodruff* v. *Superior Court,* 237 Cal. App. 2d 749, 47 Cal. Rptr. 291 (1965) (felony murder); *Commonwealth* v. *Root,* 403 Pa. 571, 170 A.2d 310 (1961) (manslaughter conviction); but see *In re Leon,* 122 R.I. 548, 410 A.2d 121 (1980) (felony murder); *State* v. *Sotteriou,* 132 N.J. Super. 403, 334 A.2d 47 (1975), cert. denied, 70 N.J. 144, 358 A.2d 191 (1976) (manslaughter); *Commonwealth* v. *Bolish,* 391 Pa. 550, 138 A.2d 447 (1958) (felony murder). In reliance upon these cases, he maintains that, where an accomplice accidentally kills himself, there should be no criminal responsibility because a defendant's conduct would not then be a substantial factor in causing the accomplice's death. Although we agree that a defendant's conduct must be a substantial factor in bringing about his accomplice's death, we do not agree that the jury could not have reasonably concluded that the defendant Pellegrino's conduct was a substantial factor in causing Memoli's death.

Evidence was presented that the defendant was Memoli's employer, that he called Memoli the night of the fire, and that he was driving the car that picked up

Memoli. The evidence also established that the defendant was burned on his face and hands. From this and other evidence the jury could have reasonably concluded that he was at the fish market and played a substantial role in starting the fire that eventually took Memoli's life. It may be, as the defendant suggests, that Memoli's own carelessness contributed to his demise. But the fact that Memoli may have been negligent with respect to his own safety can no more relieve the defendant of criminal liability than if Memoli had been an innocent victim who was contributorily negligent.[22] See *State* v. *Alterio,* 154 Conn. 23, 220 A.2d 451 (1966).

B

We also find that the jury could have reasonably concluded that the defendant started a fire with the intent to destroy the fish market while aware of Memoli's presence in the building. His mysterious nocturnal visit to Memoli's residence as well as the fact that both men left together supports the jury's conclusion that they were acting in concert. Moreover, the fact that the defendant was severely burned on the hands and face on the night of the fire[23] further supports the jury's

---

[22] We disagree with the authorities cited in the body of the opinion that hold that where a person voluntarily engages in reckless conduct with another his death cannot be caused by the other coparticipant. In such circumstances there can be little doubt that but for the defendant's participation in the reckless conduct, the deceased would not have met his demise. The issue as we view it is whether the accomplice's participation is sufficient to establish an intervening cause exculpating the defendant. This question is one of policy, and in this respect we discern no intention on the part of the legislature to distinguish between innocent negligent victims and accomplices who contribute to their own death.

[23] There was evidence apart from the prosecutor's improper remarks upon which the jury could have relied in concluding that the defendant had fabricated the cause for his burns. For example, the hospital where the defendant was treated was only a few blocks from the spot where he claimed his injuries were inflicted. The jury could have concluded that, if the defendant had in fact been burned at the place claimed, he would have proceeded directly to the hospital rather than first return to his home, which was some distance away.

 

conclusion that he was substantially responsible for starting the fire. Although there was no direct evidence of the part he played in igniting the fire, there was sufficient circumstantial evidence from which the jury could reasonably have concluded that the defendant was responsible for the explosion and fire.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.