# State of Connecticut *v.* Wilfredo Fernandez
## (10771)

Healey, Shea, Dannehy, Santaniello and Callahan, Js.

Argued October 4—decision released December 10, 1985

*Colleen M. O'Connell,* certified legal intern, with whom were *Todd D. Fernow,* and, on the brief, *Michael R. Sheldon* and *Edward R. Scofield,* certified legal intern, for the appellant (defendant).

*Elizabeth B. Leete,* special assistant state's attorney, with whom were *Carl Schuman* and, on the brief, *David Newman,* assistant state's attorneys, for the appellee (state).

ARTHUR H. HEALEY, J. Upon a trial to a jury, the defendant Wilfredo Fernandez was found guilty of the crimes of burglary in the third degree in violation of General Statutes § 53a-103 and larceny in the second degree in violation of General Statutes (Rev. to 1979) § 53a-123.[1] This appeal followed.

On appeal, the defendant claims that the trial court erred: (1) in conducting a "partisan cross-examination" of the only defense witness, which resulted in the denial of his right to trial by an impartial jury, his right to put on a defense and his right to a fair trial; (2) in its jury instructions on the elements of larceny in the second degree in that it unconstitutionally relieved the state of its burden of proving that he acted with the requisite specific intent; and (3) in concluding that the evidence presented was sufficient to justify a verdict of guilty on either of the crimes involved. We find error on the first issue and remand for a new trial. We find

---

[1] General Statutes § 53a-103 provides in part: "(a) A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

General Statutes (Rev. to 1979) § 53a-123 provides in part: "(a) A person is guilty of larceny in the second degree when . . . (2) the value of the property or service exceeds five hundred dollars . . . ."

General Statutes § 53a-119 provides in part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."

no error on the third issue and will discuss the second issue only to the extent necessary to guide the trial court in connection with a new trial.

We turn first to the claim involving the conduct of the trial judge. Some of the facts which the jury could reasonably have found are as follows: The crimes of which the defendant was found guilty arose out of the burglary of a Western Auto store in a Bridgeport shopping center around midnight on March 5, 1980. Two state's witnesses who were leaving a nearby bowling alley about that time heard the sound of breaking glass and observed a person running from the direction of the store. They observed the person jump into the passenger side of a van parked in front of the store. The van immediately sped away and both witnesses followed it in their car and made note of its license number. They then returned to the store where the police had already arrived in answer to a silent alarm. They described the van and gave its license number to the police, who in turn radioed the information to a dispatcher.

About three to five minutes after the police broadcast the information, another Bridgeport police officer spotted the van a short distance away. After using the siren and lights on his police car, he stopped it. When he stopped the van, the defendant was in the driver's seat and his brother, Reuben Figueroa, was in the front passenger's seat. This officer ordered the two occupants of the van to get out of the vehicle. When they did, he placed them under arrest. While handcuffing the defendant, the officer observed an inch-long cut on his right wrist which he described during his testimony as having "fresh blood, but not flowing," "semi-coagulated." The police search of the van at that time disclosed three television sets and a "large bulky hammer" inside the side panel door. The manager of the Western Auto store came to the store shortly there-

after and reported that three television sets were missing. The front window of the store had been broken.

The defendant's trial took place in October, 1980, at which time the state produced the following witnesses: the two witnesses who pursued the van and obtained its license number, the two police officers who responded to the silent alarm at the store, and the police officer who actually apprehended the defendant and his brother. The defendant did not testify at the trial. His brother, Reuben Figueroa, was the only witness produced by the defense. On August 20, 1980, prior to the defendant's trial, Figueroa had pleaded guilty to charges, arising out of this incident, of burglary in the third degree and larceny in the second degree. He had not been sentenced as of the time he testified at his brother's trial. He testified that no one had promised him anything in return for pleading guilty and that there was no plea bargain. The trial judge at the defendant's trial was the same judge before whom Figueroa had entered his guilty pleas in August, 1980.

On direct examination, Figueroa said that the defendant, who owned the van, had picked him and a friend up earlier on the evening of the burglary and that they had had a couple of bottles of brandy to drink. Because the defendant had had too much to drink, he told Figueroa to drive as he could not, and he then fell asleep on the bed in the back of the customized van. Figueroa, who needed money to buy drugs, stopped at the Western Auto store, "pulled out" a hammer and broke the store window. He and the "other kid," who he said was also in the van, went inside. Figueroa testified at the trial that he went in twice and brought out one television each time and that the "other kid" went in just once and brought out one television. He also said that the defendant took no part in this break because he was asleep in the bed in the rear of the van but that "some-

body else did." When defense counsel asked him who that person was, he answered: "I would like to keep his name out of the Court."

Figueroa maintained that he drove the van away from the store, and when he saw the flashing light of the pursuing police cruiser he woke up the defendant. He did this because he did not have a license at the time and because the defendant owned the van. Thereupon, the defendant, according to Figueroa, assumed the driver's seat. The "other kid," Figueroa said, was able to exit the "slide door" on the passenger side of the van and "took off" unnoticed by the police officers who had stopped the van.

On cross-examination, Figueroa reiterated that he had been drinking and was using drugs at the time. He also said that he broke the store window with a hammer and that he went into the store twice bringing out one television each time. The "other person" only went in once. After he was further questioned by the state and after he admitted that he remembered pleading guilty on August 20, 1980, the state indicated that it wanted to introduce a certain transcript to impeach Figueroa's credibility. At that juncture, the following occurred:

"Q. Mr. Figueroa do you remember telling Your Honor at the time that you pled guilty to the three crimes that you were charged with and pled guilty to, that you went inside. That once inside, you grabbed a couple of television sets and then went back outside. When his Honor asked you how many times you went in and out. You said just once. His Honor said, 'just once, are you sure of that?' You replied, yes. He said, 'how many television sets did you take?' You said, 'one.' Do you remember saying that?

"A. No, I'm sorry, he asked me and I told him twice.

"The Court: You never said that?

"A. No, I did not.

"The Court: You can introduce it now. I will see it first. Mr. Figueroa, I will ask you once more. I just want to make sure. On August 20, 1980 in this Courtroom, did you remember me saying to you, how many times did you go in and out. And you said, huh, do you remember saying that?

"A. Yes, but—

"The Court: Just wait, let me do this. I said 'how many times did you go in and out?' And you said, 'just once.' Do you remember saying that?

"A. No, I do not.

"The Court: I said, 'just once, are you sure of that?' You said, 'yes.' Do you remember saying that?

"A. No.

"The Court: Then you never said that?

"A. I never said that. I told you twice, and I remember saying that. Because you had asked me—

"The Court: I don't want to hear anything more. [A]ny objections?"[2] The balance of the cross-

---

[2] At that time the following colloquy took place:

"Mr. Florek: I am objecting to the introduction that ah—

"The Court: Legal basis.

"Mr. Florek: Your Honor, the purpose of the Prosecution is to impeach Mr. Figueroa [sic] credibility.

"The Court: That's all it's used for.

"Mr. Florek: Then that's fine. Nevertheless, Your Honor I think—

"The Court: Counsel, when you say that's fine, tell me what you mean. I am not clear on that. That means you have no objection?

"Mr. Florek: No it means, I do have an objection.

"The Court: Okay, I will hear the objection. A legal objection.

"Mr. Florek: My objection is that the impeachment is too tenuous in this situation. Your Honor, it's not what Mr. Newman, the Prosecutor is trying to impeach him on the basis of.

examination by the state is significant in two respects: Figueroa again maintained that he entered the store twice and that while he loved his brother, the defendant, and would do anything he could for him, he had pleaded guilty "because I did do it. He had no part in it."

On redirect, he reiterated his love for his brother but said he had pleaded guilty "because I did it" and his brother did not have anything to do with it. Thereupon, after the state and defense counsel indicated that they had no further questions of Figueroa, the following occurred:

"The Court: Mr. Figueroa, who was with you?

"A. Who was with me?

"The Court: Yes.

"A. I don't want to say the person's name.

"The Court: I will ask you once more, who was with you?

"A. I cannot say the person's name, the person that was with me is in jail at this moment.

"The Court: Maybe you weren't clear about what I asked you. Who was with you?

"A. Like I said before, I cannot say that person's name.

"The Court: Is it that you cannot or will not?

"A. I cannot.

"The Court: Can't.

---

"The Court: Counsel, don't tell me a story. I heard your legal basis. Your claim?

"Mr. Newman: Relevant, Your Honor, impeaches the witness credibility.

"The Court: Overruled.

"Mr. Florek: Can I have an exception, Your Honor?

"The Court: You can have an exception. . . ."

"A. I don't know what that would bring upon myself, saying that person's name.

"The Court: I ask you once more, what is his name?

"A. I can't say his name.

"The Court: Any questions based on my questions Mr. Florek?

"Mr. Florek: No questions, Your Honor.

"The Court: Any questions based on my—

"Mr. Newman: No Your Honor."

The defense then rested its case; there was no rebuttal offered.

During its charge to the jury, the trial court included the following in its instructions: "Now one other subject that I should mention to you, is that you are not to infer or take any meaning from the [intonation] of my voice or the [manner] in which the Court has to [sic] replied to or spoken to counsel or witnesses in the [course] of the trial. Be as objective and as fair as you can in weighing the credibility of the witnesses that you have heard. Do not feel, as a result of any questions I may have asked any witness, that I have endorsed, accepted, or rejected so much of the testimony which I inquired about. As it is in no way intended to remove that testimony from your consideration as to its credibility."[3]

Against this background, the defendant's essential claim of error is that by the trial judge's "partisan" examination of the only defense witness the judge became an "unsworn impeachment witness" for the prosecution and thus deprived the defendant of his right to trial by an impartial jury, his right to put on a defense

---

[3] This is the instruction which the state claims was "curative" of any of the defendant's claims with respect to the trial court's conduct, if there was any error.

before that jury and his right to a fair trial. Pointing to the colloquies between the trial judge and Figueroa, the defendant further argues that the "curative" instruction did not remedy the denial of his constitutional rights. Rejecting the state's argument that the trial judge did not "testify" but only questioned permissibly from a document, the defendant contends that the trial judge proceeded as a cross-examiner and that the effect was to indicate that his memory of the plea proceedings did not "mesh" with Figueroa's testimony. In addition, the defendant argues that the questioning in the second colloquy was consistent with the judge's questioning of Figueroa in the earlier colloquy and that it, in effect, served "to inform the jury that the judge did not believe the witness' [Figueroa] testimony and, by extension, the entire defense theory of the case." The state disputes the defendant's claims and counters that the trial judge did not "testify" but rather that he permissibly tracked the transcript of Figueroa's plea proceeding as he read it. The state maintains that the missing "third man" colloquy was proper and not partisan, keeping in mind that Figueroa had waived his privilege against self-incrimination to testify and had no right to refuse to identify the missing "third man." The state also contends that the trial judge did not indicate his opinion as to Figueroa's credibility or "tell the jury that his opinion was for their consideration" but maintains that his "questions disclose[d] only a concern for the truth." The state claims that any error, if any there were, was cured by the jury instructions which made clear that the credibility of witnesses was strictly for the jury to decide.

In any event, the state claims that we should not review this claim of error because no objection was made at trial and neither *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), nor the "plain error" doctrine, both advanced by the defendant to afford review,

should permit our review here. The second "exceptional circumstance" permitting review under *Evans* is "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." *State* v. *Evans,* supra, 70. Our examination of the record demonstrates that it is adequate to support this claim.

" 'Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. U. S. Const., amend. XIV; Conn. Const., art. I, § 8; *Lisenba* v. *California,* 314 U.S. 219, 62 S. Ct. 280, 86 L. Ed. 166 [1941]; *Wojculewicz* v. *Cummings,* 145 Conn. 11, 19, 138 A.2d 512, cert. denied, 356 U.S. 969, 78 S. Ct. 1010, 2 L. Ed. 2d 1075 [1958]. In a criminal trial, the judge is more than a mere moderator of the proceedings. It is his responsibility to have the trial conducted in a manner which approaches an "atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." *Glasser* v. *United States,* 315 U.S. 60, 82, 62 S. Ct. 457, 86 L. Ed. 680 [1942]; *Quercia* v. *United States,* 289 U.S. 466, 469, 53 S. Ct. 698, 77 L. Ed. 1321 [1933].' *State* v. *Echols,* 170 Conn. 11, 13, 364 A.2d 225 (1975)." *State* v. *Gordon,* 197 Conn. 413, 424–25, 497 A.2d 965 (1985). "The function of the court in a criminal trial is to conduct a fair and impartial proceeding. *Glasser* v. *United States,* [supra]." *State* v. *Bember,* 183 Conn. 394, 401, 439 A.2d 387 (1981). "The role of the Trial Judge is neither that of automaton nor advocate"; *People* v. *Yut Wai Tom,* 53 N.Y.2d 44, 56, 422 N.E.2d 556, 439 N.Y.S.2d 896 (1981); nor is a judge merely an "umpire in a forensic encounter" but "[h]e is a minister of justice" and in "whatever he does . . . the trial judge should be cautious and circumspect in his language and conduct." (Citations omitted.) *Cameron* v. *Cameron,* 187 Conn. 163, 169, 444 A.2d 915 (1982); see *Quercia* v. *United States,* supra;

*State* v. *Gordon,* supra, 425. In *Yut Wai Tom,* the New York Court of Appeals appropriately pointed out: "As defined in subdivision (a) of standard 6-1.1 of the American Bar Association Standards Relating to the Administration of Criminal Justice (Special Functions of the Trial Judge [1978]): 'The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial.' Under that standard, as the commentary to it reveals, 'it is appropriate for the trial judge from time to time to intervene in the conduct of a case. Thus, when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent. On the contrary, the judge may, by questions to a witness, elicit relevant and important facts. The judge may interrogate a witness after a cross-examination that appears to be misleading to the jury.' It is, however, important, according to that commentary that the Judge 'be aware that there may be greater risk of prejudice from overintervention than from underintervention. While the judge should not hesitate to exercise his or her authority when necessary, the judge should avoid trying the case for the lawyers.' " *People* v. *Yut Wai Tom,* supra; see *Moll* v. *State,* 351 N.W.2d 639, 644 (Minn. App. 1984).

We recognize that "[t]he trial judge occupies an impartial position and one of commanding authority, and it often happens in a court-room that he may ascertain the truth when counsel has failed." *State* v. *Cianflone,* 98 Conn. 454, 469, 120 A. 347 (1923). While it is his responsibility to conduct the trial as impartially

as is humanly possible, a trial judge must avoid "taking an apparent position of advocacy in a case before him"; he must refrain from making "remarks which are indicative of favor or condemnation or which disparage a defendant before the jury." *State* v. *Echols,* 170 Conn. 11, 14, 364 A.2d 225 (1975).

Particularly, there should be no questioning that appears to reject a defendant's credibility and implies judicial support of a prosecution witness' testimony. See, e.g., *People* v. *Jackson,* 97 Mich. App. 660, 666, 296 N.W.2d 135 (1980). This applies to any witness, and it should be kept in mind that the "[i]nterrogation of witnesses tends to assimilate the court's role with the advocate's, and may tread over the line separating the provinces of judge and jury. . . . There is the risk that the questioning [of witnesses] may bear 'the seeds of tilting the balance against the accused' and place 'the judge in the eyes of some jurors, on the side of the prosecution.' " *United States* v. *Barbour,* 420 F.2d 1319, 1321 (D.C. Cir. 1969). " 'The influence of the trial judge on the jury is necessarily and properly of great weight,' *Starr* v. *United States,* 153 U.S. 614, 626 [14 S. Ct. 919, 38 L. Ed. 841 (1894)], and jurors are ever watchful of the words that fall from him." See *Bollenbach* v. *United States,* 326 U.S. 607, 612, 66 S. Ct. 402, 90 L. Ed. 350 (1946). These admonitions and cautions "are prompted by the truism that a jury has a natural tendency to look to the trial judge for guidance, and may find it even where it is not intended. The judge's attitude and the result he supposedly desires may be inferred by the jury from a look, a lifted eyebrow, an inflection of the voice—in many cases without warrant in fact." *State* v. *Boyd,* 222 Kan. 155, 159, 563 P.2d 446 (1977).

The trial judge can question witnesses both on direct and cross-examination. For example, it may be necessary to do so to clarify testimony as he has a "duty to

comprehend what a witness says as much as it is his duty to see that the witness communicates with the jury in an intelligible manner." *Ray.*v. *United States,* 367 F.2d 258, 261 (8th Cir. 1966), cert. denied, 386 U.S. 913, 87 S. Ct. 863, 17 L. Ed. 2d 785 (1967), quoted in *State* v. *Bember,* supra, 402; *State* v. *Cianflone,* supra, 468. While no precise theorem can be laid down, we have held that it is proper for a trial court to question a witness in endeavoring, without harm to the parties, "to bring the facts out more clearly and to ascertain the truth"; *Goggins* v. *Fawcett,* 145 Conn. 709, 713, 147 A.2d 187 (1958); in trying to bring out the facts to resolve a doubt it apparently had as to the admissibility of certain evidence; *Hutchinson* v. *Plante,* 175 Conn. 1, 3, 392 A.2d 488 (1978); in undertaking reasonable efforts to restrain a garrulous witness; *Felix* v. *Hall-Brooke Sanitarium,* 140 Conn. 496, 502, 101 A.2d 500 (1953); and in intervening where the witness is embarrassed, has a language problem or may not understand a question. *State* v. *Cianflone,* supra.

Judge Kaufman, in speaking for the Second Circuit Court of Appeals, wisely observed that "[t]here is simply no handy tool with which to gauge a claim that a judge's conduct improperly has shifted the balance against a defendant." *United States* v. *Nazzaro,* 472 F.2d 302, 304 (2d Cir. 1973). Such a decision is reached "only after the most thorough and careful deliberation," as in such cases the court faces a "special quandary" stemming from the fact that " '[the court is] not given the benefit of witnessing the juxtaposition of personalities which may help prevent reading too much into "the cold black and white of a printed record." ' *United States* v. *Grunberger,* 431 F.2d 1062, 1067 (2nd Cir. 1970)." *United States* v. *Nazzaro,* supra. Error found in the conduct of a trial judge which, upon the whole record, can safely be said to have deprived a criminal defendant of a fair trial cannot, however, be ignored.

There is no doubt that a criminal trial court judge has a difficult task and is forced at each trial to make many decisions. Nevertheless, the jury alone is the trier of fact and any trespass, actual or reasonably perceived, on that exclusive function requires special scrutiny.

With that, we take up first the trial judge's questioning of Figueroa concerning his testimony at the trial as compared with his statements to the same judge when he pleaded guilty to crimes which were the subject of the defendant's trial. After defense counsel had examined Figueroa about his earlier guilty plea, the state cross-examined him concerning the number of times he entered the store during the burglary. Receiving what it claimed were inconsistent responses from Figueroa, the state indicated to the court that it wished to impeach him by the transcript of the guilty plea proceedings. The trial judge intervened and proceeded to examine Figueroa on this. A certified copy of that portion of the transcript upon which the trial judge examined Figueroa was made an exhibit and passed to the jury at that time. It is unrealistic to downgrade the impact upon the jury of this questioning, especially when it came from the trial judge who had also taken the guilty plea, and where its object was the sole defense witness.[4] See *State* v. *Lint,* 361 A.2d 926 (Me. 1976). Significantly, the object of this judicial examination was the witness who had said, both in pleading guilty and in his testimony in this case, that *he,* and *not* the defendant, had committed the crimes charged. This directly implicated his credibility. Moreover, the state's admitted theory in this case was that the defendant was liable as a principal and not as an aider or abettor.[5] His credibility, thus implicated, called seriously

---

[4] The defendant did not testify at the trial.

[5] The state's brief freely admits on appeal that the defendant "is correct in his contention that the *only* theory on which the Defendant can be convicted is that he actually entered the building and took the property in question." (Emphasis added.)

into question the defense theory at trial that the defendant, because he was asleep in the rear of the van due to his intoxication, slept throughout the actual break and never entered the store. Figueroa's credibility on the third "missing person" theory could not escape the tremor emanating from that examination by the trial judge.

While it is true that whether the due process requirement of the fourteenth amendment of fundamental fairness in state criminal proceedings is met is generally considered on a case-by-case basis, "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers* v. *Mississippi,* 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); see *Snyder* v. *Massachusetts,* 291 U.S. 97, 116, 54 S. Ct. 330, 78 L. Ed. 674 (1934). We have no reason to doubt that the trial judge, in each colloquy, was basically concerned about putting the truth before the jury. Good intentions, however, cannot serve to obviate an unconstitutional deprivation of a fair trial. Where credibility was so significant, as it was here, a trial judge should eschew an examination of a key witness which might easily have given the jury the impression that the court had doubts concerning the truthfulness of his testimony on a crucial issue. See *United States* v. *Tobin,* 426 F.2d 1279, 1283 (7th Cir. 1970); see also *People* v. *Jackson,* supra (trial court's cross-examination of defendant held error where it "cast a cloud of judicial skepticism" over such testimony). This record discloses that this occurred in this case.[6] Even where "an alert and capable judge . . . feels that he can assist . . . by participating in the interrogation of witnesses . . . he would

---

[6] Whether the evidence of guilt is "overwhelming" or the case was a "close call" has been given weight in assessing an error such as that claimed in this case. See, e.g., *United States* v. *Pellegrino,* 470 F.2d 1205 (2d Cir. 1972), cert. denied, 411 U.S. 918, 93 S. Ct. 1556, 36 L. Ed. 2d 310 (1973); *United States* v. *Hill,* 332 F.2d 105 (7th Cir. 1964).

ordinarily do well to forego such intrusion upon the functions of counsel, thus maintaining the court's position of impartiality, in the eyes of the ever-observant jurors." *United States* v. *Carmel,* 267 F.2d 345, 350 (7th Cir. 1959); *United States* v. *Tobin,* supra, 1282; *United States* v. *Hill,* 332 F.2d 105, 106 (7th Cir. 1964); *People* v. *Yut Wai Tom,* supra, 57 ("[a] Trial Judge's examination of witnesses carries with it so many risks of unfairness that it should be a rare instance when the court rather than counsel examines a witness"). The fact that neither of the two colloquies was as lengthy as in some cases does not militate against reversible error because, on balance, in the final analysis, the ultimate test must be substance, not quantity.

The questioning in this case also worked to disadvantage the defendant's case in that it fairly tended to convey to the jury the trial judge's "own notion" of what inferences might be reasonable for it to draw. See generally *United States* v. *DeLoach,* 504 F.2d 185, 190 (D.C. Cir. 1974). The challenged questioning did "undercut" the defendant's case. *United States* v. *Hill,* supra, 1207; *United States* v. *Brandt,* 196 F.2d 653, 656 (2d Cir. 1952). The questioning on both occasions was better left to counsel and was in the nature of an examination that inured to the benefit of the state.

We are certainly not suggesting that trial judges absolutely refrain from examining witnesses. Rather, we are suggesting that it be done when justice so requires but with caution and circumspection lest an appearance of partiality, although not intended, emerge. Judicial conduct that takes "on the aspect of advocacy" must be avoided. *Blunt* v. *United States,* 244 F.2d 355, 365 (D.C. Cir. 1957) (Bazelon, J.). As we have already noted, greater restraint is required in criminal cases. See 81 Am. Jur. 2d, Witnesses § 420; 2 Wharton, Criminal Evidence (13th Ed. Torcia) § 407. In explicating the role of the impartiality of the trial judge,

Judge Learned Hand said: "Prosecution and judgment are two quite separate functions in the administration of justice; they must not merge." *United States* v. *Marzano*, 149 F.2d 923, 926 (2d Cir. 1945); see *Johnson* v. *Scully*, 563 F. Sup. 851, 859 (E.D.N.Y 1983). Judge Kaufman's statement in *Nazzaro* is also apposite here: "an appearance of impartiality and judicious detachment must prevail at all times. While concededly the line separating permissible and impermissible judicial conduct in the courtroom is drawn with the finest point, we are of the firm view that the line was crossed in this case." *United States* v. *Nazzaro*, supra, 313. That line was crossed in this case. The prejudice that resulted from the denial of the defendant's constitutional right to a fair trial requires that we order a new trial. *State* v. *Gordon*, supra, 425–26.

In reaching this result, we also concluded that the curative instruction did not cure the impact of the prejudice caused. See *Quercia* v. *United States*, supra, 472; *United States* v. *Nazzaro*, supra, 312–13. Such instructions ordinarily do prevent reversible error. Judges, both appellate and trial, may expect, "as they must if our judicial system is to survive, that conscientious jurors will respect and follow the instructions . . . ." *State* v. *Manley*, 54 N.J. 259, 270, 255 A.2d 193 (1969). We have always given great weight to curative instructions in assessing claimed errors. See *State* v. *Binet*, 192 Conn. 618, 632, 473 A.2d 1200 (1984); *State* v. *Ubaldi*, 190 Conn. 559, 563, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). Yet we have said that "a curative instruction is not inevitably sufficient to overcome . . ." the impact of prejudice. *State* v. *Tinsley*, 180 Conn. 167, 170, 429 A.2d 848 (1980); see also *Jackson* v. *Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). Only when we are persuaded, as we are here, that the prejudicial impact of the examination resulting from

the two colloquies has probably overborne reasonable juror conscientiousness must we decline to accept the claimed efficacy of a curative instruction. This is one of those rare cases when we are so persuaded.

The defendant next claims that the trial court's instructions to the jury on the element of intent required for conviction of larceny in the second degree[7] violated his constitutional rights by relieving the state of its burden of proving the requisite specific intent in violation of *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). We agree with the defendant's argument that if we find, as we do, reversible error on the claimed error addressed to the conduct of the trial judge, a new trial must be ordered on both the larceny and the burglary charges even if we were to resolve the *Sandstrom* issue in favor of the state. We address the *Sandstrom* claim for the purpose of providing guidance at the new trial inasmuch as the challenged instruction was erroneous.

As there was no objection to the charge to the jury nor a request for a different charge after the instructions were given, it must first be determined whether this claim of error is reviewable under the "exceptional circumstances" rule of *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). "[W]e have repeatedly held that a claim of error under *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), can be considered under the 'exceptional circumstances' rule of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). *State* v. *Mason,* 186 Conn. 574, 582, 442 A.2d 1335 (1982); *State* v. *Cosgrove,* 186 Conn. 476, 482–83, 442 A.2d 1320 (1982); *State* v. *Arroyo,* 180 Conn. 171, 173–74, 429 A.2d 457 (1980)." *State* v. *Shine,* 193 Conn. 632, 644 n.11, 479 A.2d 218 (1984); see *State* v. *Johnson,*

---

[7] The defendant concedes that the "language of the specific burglary charge was sufficiently precise and elaborate to alleviate any constitutional infirmity in the general instructions on the issue of intent."

185 Conn. 163, 167, 440 A.2d 858, aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983). We will review this claim.

In its general instructions to the jury on intent, the trial court stated: "With regard to the question of intent, intent may also be presumed. This is because a man is presumed to have intended to do the act which he did. Accordingly until some credible evidence comes into the case tending to prove that because in the light of the circumstances as he honestly and in good faith believe[s] them to be, the act which he did would appear to be lawful or because the act was an accident until such credible evidence appears in the case.[8] The State may rest upon an assumption that an accused intended to commit an act which he did commit. So I will charge you again as to intent, as to whether you—not whether you, the fact that you must have intent for a criminal act, but the State may rely on a presumption for that."

The defendant claims that this general instruction to the jury on intent combined with specific instructions on the larceny count impermissibly shifted the burden of proof to the defendant, thereby relieving the state of its burden of proof on intent. The state claims that the general instructions on intent merely created a presumption which shifted the burden of production to the defendant and that such shifting of the burden of production should be held constitutional because it does not offend due process. In any event, the state claims that the instructions on the intent required for conviction of larceny, taken as a whole, are not erroneous.

The United States Supreme Court in *Sandstrom* v. *Montana*, supra, 517, 524, held that a jury instruction

---

[8] The state, in its brief, suggests that the punctuation of the transcription of the instruction should omit the misplaced period after "case" and continue it as one sentence.

which stated that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts" may have been interpreted by the jury "as constituting either a burden-shifting presumption . . . or a conclusive presumption . . . ." "[E]ither interpretation would have deprived defendant of his right to the due process of law" and was therefore unconstitutional. *Sandstrom* v. *Montana,* supra, 524. It should be noted that "*Sandstrom* does not invalidate, for example, the use of an 'entirely permissive inference or presumption, which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and that places no burden of any kind on the defendant.' *Ulster County Court* v. *Allen,* 442 U.S. 140, 157, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979). . . ." *State* v. *Johnson,* supra, 167–68.

It has been firmly established as a constitutional right that the state bears the burden of proof beyond a reasonable doubt on each essential element of the crime charged. *In Re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); see *State* v. *Griffin,* 175 Conn. 155, 162, 397 A.2d 89 (1978). General Statutes §§ 53a-119 and 53a-123 define larceny in the second degree, of which the defendant was convicted, as including the "intent to deprive another of property or to appropriate the same to himself or a third person." A specific intent is an essential element of larceny in the second degree and as such must be proved beyond a reasonable doubt by the state. *State* v. *Harrison,* 178 Conn. 689, 694, 425 A.2d 111 (1979) (state must prove intent in an accessory to attempted robbery charge).

The burden of proof on intent "ordinarily can be borne only by the presentation of circumstantial evidence, because intention is a mental process that necessarily must be proved through inferences drawn from the defendant's statements and actions." *State* v.

*Harrison,* supra, 695. Despite the elusive nature of proving intent, the state cannot escape its burden that it must prove intent when it is an element of the crime charged.

An instruction such as the one given in this case is worded in terms of a presumption and shifts the burden to the defendant to prove that he did not have the required mental state or intent. Shifting the burden of proof on an essential element to the defendant "denies him the protections of the presumption of innocence and of due process of law." Id., 693; see *In Re Winship,* supra, 364. The trial court's general instructions in this case almost parallel those which we have on prior occasions deemed violative of due process absent a sufficient cure. *State* v. *Truppi,* 182 Conn. 449, 452–53, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981); *State* v. *Harrison,* supra, 692.

Finally, the defendant claims that the evidence was insufficient to establish his guilt of either crime charged beyond a reasonable doubt. "Although we have ordered a new trial, 'we must also address this claim, because if we were to rule that the evidence was insufficient, the defendant would be entitled to an acquittal rather than a new trial. *Burks* v. *United States,* 437 U.S. 1, 18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978).' *State* v. *Ferrell,* 191 Conn. 37, 46, 463 A.2d 573 (1983). ' "In determining whether the evidence is sufficient to sustain a verdict, 'the issue is whether the jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt.' . . ." (Citations omitted.) *State* v. *Giguere,* 184 Conn. 400, 402–403, 439 A.2d 1040 (1981); see also *Jackson* v. *Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct.

195, 62 L. Ed. 2d 126 (1979).' *State* v. *Reid,* 193 Conn. 646, 666, 480 A.2d 463 (1984). In reviewing the evidence we must construe it in a light most favorable to sustaining the verdict. *State* v. *Ferrell,* supra." *State* v. *Pellegrino,* 194 Conn. 279, 294, 480 A.2d 537 (1984).

In making this claim, the defendant argues that the sole theory upon which his conviction can be predicated is that he actually entered the store and took the property in question. The state agrees with this claim and argues that the evidence was sufficient to support the conviction of each crime charged on this theory. We agree with the state.

We have set out earlier certain evidence concerning the crimes charged which was before the jury and which it could reasonably have found. From this evidence, the jury could have reasonably inferred that the defendant entered or at the very least reached inside the store and removed at least one of the three stolen television sets found in the van by the police. It could also have reasonably inferred that the cut on his right wrist came about from his going in past or reaching past the broken glass of the store to remove a television. The evidence of the arresting police officer's observation, less than ten minutes after the break, of the blood on the cut wrist as "semi-coagulated," "fresh blood, but not flowing" is significant. Moreover, the jury could have credited Figueroa's testimony that he himself removed only two of the three television sets from the store even if it did not credit his testimony regarding the unnamed missing person who he testified participated with him in these crimes. The jury could thus have reasonably found that the defendant was the only one who could have entered the store and removed the third television set. "There is no legal distinction between direct and circumstantial evidence so far as probative force is concerned." *State* v. *Little,* 194 Conn. 665, 673, 485 A.2d 913 (1984), quoting *State* v. *Cari,* 163 Conn. 174,

179, 303 A.2d 7 (1972). In sum, employing the required standard of review, the evidence was sufficient to permit the jury to find the essential elements of each of the crimes charged proved beyond a reasonable doubt.

There is error, the judgment is set aside on both counts and a new trial is ordered.

In this opinion the other judges concurred.