STATE OF CONNECTICUT *v.* THOMAS GRAHAM
(6974)

DALY, NORCOTT and FOTI, Js.

Argued October 10, 1989—decision released June 5, 1990

*Linda L. Morkan,* special public defender, with whom was *Leny K. Wallen-Friedman,* special public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, was *Gary W. Nicholson,* assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals from a judgment of conviction, rendered after a jury trial, of the crime of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). The defendant claims that the trial court erred (1) in conducting the proceedings in a manner that deprived the defendant of a fair trial, (2) in its ruling and instructions regarding certain prior inconsistent statements, (3) in allowing the state to exercise a peremptory challenge to exclude a black venireperson, (4) in failing to cover all the salient points requested by the defendant when instructing the jury, (5) in refusing to give a missing witness instruction, and (6) in denying the defendant's request to voir dire an expert witness. We find no reversible error.

The jury could have reasonably found the following facts. On the evening of September 15, 1987, the defendant shot four victims with a .12 gauge shotgun

in the courtyard adjacent to building 19 of the P. T. Barnum Apartments in Bridgeport. All of the victims were friends or acquaintances of the defendant and had known him for periods of time ranging from ten years to a few days. Shortly after the incident, each of the victims positively identified the defendant as his or her assailant while being treated at Park City Hospital. Three additional eyewitnesses to the shooting positively identified the defendant as the gunman. After the defendant was arrested for the shootings, the Bridgeport police performed an atomic absorption test on his hands confirming the fact that he had recently fired a gun.

I

The defendant first claims that the conduct of the trial court, viewed in its entirety, infringed upon the right of the defendant to a fair trial. In raising this claim, the defendant asserts that the judge assumed a prosecutorial role periodically during the course of the trial, that defense counsel was repeatedly denied a chance to create a record, that defense counsel was rebuked by the judge thus prejudicing the defendant, and that the judge's questioning of two witnesses went beyond the bounds of impartiality.

The defendant admits that he neither objected to the court's conduct during the course of the trial nor made a motion for mistrial because of the perceived misconduct. He argues, however, that because the remarks made by the court implicate his fundamental right to a fair trial his claim may be properly reviewed under *State* v. *Evans,* 165 Conn. 61, 67–70, 327 A.2d 526 (1973).

"Only under exceptional circumstances will this court review a claim that is raised here for the first time. . . . Review may be appropriate . . . where the record adequately supports a claim that the defend-

ant has been deprived of a fundamental constitutional right and a fair trial." (Citation omitted.) *State* v. *Cazimovski*, 20 Conn. App. 190, 191, 565 A.2d 254 (1989); see also Practice Book § 4185.

"[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

Our review discloses that the defendant's claim fails to meet the third *Golding* condition in that the record does not support the clear existence of a violation of the defendant's constitutional right to a fair trial.

Certain additional facts are relevant to the resolution of this claim. Six eyewitnesses to the shooting positively identified the defendant as the gunman.[1] All four of the victims named Graham as their assailant at the hospital immediately after the shooting and later reiterated their identification while on the witness stand. Four of the eyewitnesses went to junior high school or high school, or both, with the defendant and had known

---

[1] Seven witnesses identified the defendant as the gunman, but one of these seven was the victim, Hubert Joyner, whose testimony is contested by the defendant. Thus, we assert that six witnesses *positively* identified the defendant to demonstrate the strength of the identification.

him for a number of years. To confirm the details and extent of their school relationships, questioning by both counsel began with general background information that included the extent of the witnesses' high school education and their current occupations. One of the victims, Michael Barr, testified that after being shot in the eye by the defendant he required treatment at two separate hospitals and that he was without sight in his left eye. Barr further stated that he was a junior in high school at the time of the shooting, but had been unable to graduate with his class and had not yet returned to school.

Other relevant facts include two admissions made by the defendant the night of the incident. The first admission was made at the hospital. The second was made at the police station when Graham told one of the victims that Michael Barr was the only person he had intended to shoot.

To support his claim that he did not receive a fair trial the defendant first cites two particular instances during the course of a twelve day trial and asserts that on these occasions the judge's questioning could not be distinguished from that of a prosecutor. We disagree.

"Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . In a criminal trial, the judge is more than a mere moderator of the proceedings, and it is his responsibility to conduct a trial in a manner which approaches an atmosphere of impartiality." (Citations omitted.) *State* v. *Jenkins,* 8 Conn. App. 35, 42, 510 A.2d 1370 (1986).

A trial court has a discretionary right to intervene in the examination of witnesses where such intervention is necessary to clarify confusing testimony, restrain

an obstreperous witness, or elucidate a witness' under-
standing of a question. *State* v. *Smith,* 200 Conn. 544,
549, 512 A.2d 884 (1986).

When the comments the defendant asserts are pros-
ecutorial in nature are placed in their proper context,
the judge's questioning falls squarely within his discre-
tionary authority to moderate the trial and "do not
either singly or together, deprive the defendant of a
fair trial." *State* v. *Jenkins,* supra, 43.[2]

[2] The defendant points to the judge's questioning of both Mary Samas
and Mark Samas as prejudicial. These two witnesses are mother and son.
They testified that on the night in question they saw, from their kitchen
window in building 17, a Hispanic man with a shotgun running through
the courtyard adjacent to building 19. During the state's cross-examination,
however, Mary Samas became very unclear as to whether she could, in fact,
see the courtyard of building 19 from her apartment in building 17. In addi-
tion, the direct testimony of Mark Samas was anything but clear.
"Q. And what did you see when you looked out the window, sir?
"A. I saw a dude running from out building 19 court, ran to this dude,
and he was talking to this man. Then I seen a dude come around from build-
ing 20 into building 19, pass the dude. And I couldn't see him no more.
"Q. Okay. Now, you saw three people from your window. Is that correct?
"A. Yes.
"Q. All right. Now, did one of the people that you saw appear to you to
be holding something?
"A. Yes.
"Q. And what was that?
"A. It looked like a sawed-off shotgun.
"Q. Okay. Now did you see the entire length of the weapon?
"A. No.
"Q. Okay. But it appeared to you to be—well, could you determine from
what you saw whether or not it was a shotgun versus a rifle or anything
like that?"
The court attempted to direct defense counsel into a line of clarifying
questions that would draw the conclusion that the man Mark Samas saw
was carrying a gun only after a proper foundation had been placed on the
record.
"The Court: Why don't we ask him what he saw? See, the problem is
the witness is arriving at a conclusion. That's for the jury to determine.
What did he see? A person. And what was that person doing? And what
did you see about that person? And then he can describe whatever he saw.
But the conclusion is something the jury has to reach."
At the close of redirect examination of Mark Samas, defense counsel once
again pursued the line of questioning that prematurely drew the conclu-

The defendant also claims that he was repeatedly denied the right to create a record and was repeatedly rebuked by the court. He claims judicial indifference

---

sion that the witness saw a weapon in the Hispanic man's hand. The judge pursued the following line of questioning to clarify the witness' testimony.

"The Court: I'd just like to understand in my own mind. You're looking out the window and someone's down on the ground, according to what you observed that evening. Is that correct?

"A. Yes.

"The Court: Now, forget the language such as 'the weapon,' 'the gun,' 'shotgun,' sawed-off or whatever, what did you see? A person wearing a jacket?

"A. Yes.

"The Court: Was the jacket buttoned or open?

"A. I think it was buttoned.

"The Court: You think it was. And in what position was the gun being carried?

"A. Against his leg.

"The Court: And what was he holding it by?

"A. He was holding it by his leg, with his hand.

"The Court: And what part of the gun was in his left hand? Was it his left hand that you demonstrated?

"A. Yes.

"The Court: Yes. And what part of the gun? Barrel, stock, trigger, housing, whatever was in contact with the left hand?

"A. Probably the—

"The Court: Not probably. What did you see?

"A. Well, I just seen him have the gun pressed up against his leg. He was running then. As he ran, the gun flicked up a couple of times.

"The Court: You mean the barrel flashed in the light?

"A. Yes.

"The Court: I see. Was any part of the gun, stock, trigger, housing or barrel underneath the jacket?

"A. No, I don't think so.

"The Court: So, what you saw then was a barrel, trigger housing and a stock. Correct?"

The judge's questioning laid the proper foundation for the information to be entered, drew a more specific description of the weapon from the witness, and accepted the witness' testimony. In short, this questioning clarified and strengthened the information being placed before the jury.

The defendant also contends that the judge was acting in a prosecutorial fashion during the state's cross-examination of Mary Samas. Mary Samas referred to the events as an accident and the court asked the following question to clarify her testimony.

"A. Well, I talked—when the accident—

to both of the objections he raised and his arguments supporting his objections. Our review of the instances the defendant has brought to our attention shows no judicial indifference, but rather indicates that the following pattern developed during the course of the trial between the bench and both counsel. When an objection was made as to defense counsel's behavior or his line of questioning, both counsel were given an opportunity to present their arguments on the questions of law involved.[3] In those instances where the court ruled

---

"The Court: Well, wait a minute now.

"A. Okay. Let me say something.

"The Court: Are we here for the same thing? We're talking about September 15, 1987. You remember last September?

"A. Yes.

"The Court: And four people were shot. Do you understand that?

"A. Well, I wasn't there. I don't know what—I wasn't there at the shooting, so I don't know whether it was an accident or intentional or what. I can't answer that because I'm not God.

"The Court: I see."

Clearly, it was within the judge's discretion to pursue these questions. We cannot read any intonation or negative attitude into these remarks. "[A] reviewing court is limited to an examination of a printed record and lacks the benefit of observing the exchanges between the participants involved in the conduct of the trial." *State* v. *Jenkins,* 8 Conn. App. 35, 42, 510 A.2d 1370 (1986).

[3] The following is one instance where the defendant claims that the judge chastised his attorney in open court to the defendant's detriment. Defense counsel was conducting a cross-examination of Detective Carl Leonzi, and held a sealed atomic absorption kit, which had been entered for identification only, in his hand.

"Q. In this kit there are six swabs. Correct?

"A. I don't know. I believe there may be two for each tube.

"Q. Two for each—

"A. Tube. Two swabs in each tube. Two to do the back of the hand.

"The Court: Two for each t-u-b-e, tube.

"Mr. Mc Intosh [Defense Counsel]: Thank you.

"Q. And how many tubes?

"A. I believe there may be six in there.

"Q. All right. Did you make any kind of markings at all on the tubes that you had done?

"A. No, would I mark them—

"Q. Nothing at all?

against the defendant, he took exceptions to the rul-
ing and then attempted to continue his argument in

"Mr. Nicholson [Assistant State's Attorney]: If Your Honor please, I think
the record should reflect that defense counsel is opening that item and ques-
tioning from an item not yet in evidence. Obviously, there's going to be
someone from the lab. And I just want the record to reflect that that's now
being opened.

"Mr. Mc Intosh: Yes. It can be. Sure.

"Mr. Nicholson: Fine.

"Mr. Mc Intosh: No problem.

"The Court: Well, there is a problem. There can be no claim as to the
mishandling of that once that is opened.

"Mr. Mc Intosh: Mishandling? I don't think—

"The Court: Chain of custody, you see.

"Mr. Mc Intosh: This is the—

"The Court: Hold on now.

"Mr. Mc Intosh: May the jury be excused, please, Your Honor?

"The Court: Yes.

"(Whereupon the jury panel left the courtroom at 11 a.m.)

"The Court: That's not in evidence.

"Mr. Mc Intosh: I understand that.

"The Court: And it's not offered. It's an exhibit for identification at this
point.

"Mr. Mc Intosh: Yes, sir.

"The Court: It's sealed. You've unsealed it.

"Mr. Mc Intosh: Well, the seal's been broken.

"The Court: Well, the seal's been broken.

"The Court: Put it back. Over here. Bring out the jury. Start again. I'll
take your objection. Put it back, sealed as it was. You just can't pick up
evidence and play with it. Now, put it back in the bag.

"Mr. Mc Intosh: Judge, I'm only—

"The Court: Put it back in the bag. And you may ask permission of the
court to fool with that if you like. Then I'll hear both sides.

"Mr. Mc Intosh: Okay.

"The Court: But I cannot allow it to happen in this fashion. Now if you
intend to proceed with it, this would be the nice time to ask permission
to open that bag. You cannot do it otherwise.

"Mr. Mc Intosh: Yes, sir. I would like permission to open the bag.

"The Court: Do you have any objection to him doing that?

"Mr. Nicholson: As long as there's not going to be a later objection by
defense counsel as to the fact that it is now an unsealed bag.

"The Court: Are you prepared to make that concession?

"Mr. Mc Intosh: Yes. The bag was stapled prior to me opening the bag.

"The Court: And you opened it.

"Mr. Mc Intosh: And I opened it.

"The Court: Okay. Now, it's still—

opposition to the objection. Our review of the transcript discloses that the defendant was not cut short

"Mr. Mc Intosh: And may I have your permission to open the bag?

"The Court: Now there's permission to open which bag?

"Mr. Mc Intosh: This bag. The one with the clip on it.

"The Court: Fine.

"Mr. Mc Intosh: All right.

"The Court: You have no objection to that?

"Mr. Nicholson: I have no objection to have him opening the bag, Your Honor. But I do at this point, I am going to intercede an objection based upon the fact that we are not getting into questions—Obviously, it was marked for identification. I had to show the witness it so that he could identify it. If we're going to start getting into the contents of it and everything else, I really think it ought to be offered as a full exhibit—

"The Court: You're not going to open that.

"Mr. Nicholson:—at this stage.

"The Court: You're caught in the horns of a dilemma.

"Mr. Mc Intosh: Well, no, I'm not. I'm not caught in any kind of dilemma at all, Your Honor. What I'm trying to get across is simply this. That the state did not put a plastic bag into evidence, did not mark a plastic bag in evidence as an exhibit for identification. It marked the bag, the box, and all practical matter, its contents into evidence for identification only.

"The Court: Right.

"Mr. Mc Intosh: Now, no one, this gentlemen on the stand here, myself, I presume the state, no one as far as I know has looked into the contents—

"The Court: That's correct.

"Mr. Mc Intosh:—of this particular item.

"The Court: Not at my presence.

"Mr. Mc Intosh: And not in mine. And so my question then is the state started by talking about the particular test with this witness. What I want to do and I will certainly stipulate that at the present, the plastic case of state exhibit A is taped shut with two—what appears to be scotchguard, regular magic tape things. On the other hand, there is an orange label that says 'Evidence. Warning. Leave sealed. Do not remove' which is broken, which I did not break.

"The Court: Right.

"Mr. Mc Intosh: My line of questioning with this particular witness is simply to find out how many of the swabs he used and whether or not these tubes looked like the ones that he used. And that, as long as it's in evidence for purpose of identification, he can certainly—extends to the contents, as well.

"The Court: It does not. Okay. The state has the burden of proving the case against the accused.

"Mr. Mc Intosh: Yes.

"The Court: The state has made an offer of that for identification only, to lay the foundation for a chain of custody.

without first having had ample opportunity to present his case.[4]

"Mr. Mc Intosh: Right.

"The Court: And at the proper time, they're going to make an offer.

"Mr. Mc Intosh: Yes.

"The Court: Now, it's not in evidence. If you want to make an offer that it be a full exhibit, then it's fair game. But I don't know if the State would object because there's no foundation for the contents of that box, and that requires testimony from the forensic laboratory.

"Mr. Mc Intosh: But that's my point, Your Honor. The forensic laboratory got the box and opened the contents. This man did the same thing. The only thing that he didn't do was analyze the results.

"The Court: No, he opened a box and utilized a swab.

"Mr. Mc Intosh: I'm sorry.

"The Court: He utilized the swabs therein, and he placed them back into the containers—

"Mr. Mc Intosh: That's correct.

"The Court:—gave it for delivery to the forensic. That's as far as we know.

"Mr. Mc Intosh: That's correct.

"The Court: It went in somewhere and Sergeant Fedorak brought it back, and the records reflect that he returned it to the Bridgeport police.

"Mr. Mc Intosh: And what we do not know is whether or not the swabs in here which appear to have labels on them are the ones that he put in this box. And with that, the forensic lab would not be able to testify to because they don't know whether or not he put those in there or not. They can say that these were in the box that came up, but they would not be able to lay the foundation as to whether or not these were the ones that this gentleman put in there. And that is what I am attempting to establish at this point. Because all we have is a box with swabs that may have come from this investigation or part of another investigation. And I'm not going to parade them in front of the jury or anything like that, but it goes along with the other question I have about basically how he conducted the test. And, as I said, defense is willing to stipulate, if the court sees fit in its discretion, to allow us to open the case which this witness saw already done.

"The Court: Since it's been analyzed?

"Mr. Mc Intosh: Prior to its analyzation.

"The Court: Sustain the objection.

"Mr. Mc Intosh: Exception, please.

"The Court: Bring out the panel."

[4] The defendant excerpts a portion of the pretrial voir dire, of the jury to exemplify the judge's indifference to his objections. When viewed in the context of the surrounding pages of the transcript, it is clear that defense counsel had ample opportunity to be heard by the court. At this point in the voir dire, counsel objected to the court's excusing the only black venireperson and argued his point through the course of three pages of

The defendant also asserts that the trial court denied him a fair trial by inexcusably buttressing the testimony of two state's witnesses. The first witness the defendant claims was bolstered by the court was Hubert Joyner. The defendant asserts that Joyner's testimony was rambling and inconsistent and that the court's inquiry as to why he was "so slow this morning" before he left the witness stand impermissibly added to the witness' credibility.

The second witness whose credibility the defendant claims was impermissibly buttressed by the court was Michael Barr. Barr was questioned by both counsel as to the nature and extent of his eye injuries. At the close of Barr's testimony, the court asked him if he was going to finish his education. When he responded affirmatively, the court responded "Very good."

"The court's questioning of a witness is not necessarily improper because it draws attention to the strengths or weaknesses of a party's case. . . . However, the court should avoid questioning witnesses in a manner that reflects in any fashion on their credibility. . . . Determinations of credibility are solely the function of the jury." (Citations omitted.) *State* v. *Smith,* supra, 550.

To support his claim that the court's remarks inexcusably enhanced the credibility of Barr's testimony,

the transcript. When the court ruled against the defense counsel's objection, he asked for an exception and was granted one. Counsel then reargued the merits of his objection for an additional three and one-half transcript pages. The excerpt gleaned from the transcript for our review comes one and one-half pages after the court had granted the defendant an exception to his ruling. The excerpt consists of three lines of counsel's own dialogue insisting that his argument was not off track and offering to give an explanation. The court's reply that "I don't want you to. All I want you to do is preserve your record" may be curt, but, in light of the surrounding circumstances, it was not prejudicial to the defendant.

the defendant cites *State* v. *Smith,* supra. In *Smith,* our Supreme Court held that the trial court's questioning of the state's witness about his time as a hostage in Iran tended to enhance the witness' credibility.

The present case can be readily distinguished from *Smith.* First, it should be noted that although the defendant in *Smith* did not immediately object to the judge's questioning, he did move for a mistrial the following day. The defendant in the present case neither objected to the trial court's questioning nor moved for a mistrial.

The second distinction lies in the factual circumstances of the *Smith* case as compared to the case at hand. In *Smith,* the defendant was accused of an assault against a police officer in a Hartford police department elevator. The defendant and the officer were the only two passengers in the elevator at the time of the altercation and were the only two witnesses at trial. The defendant's version of the altercation was significantly different from the officer's. "Which version of the incident the jury accepted as true largely depended on whether it perceived [the officer] or the defendant as the more credible witness." *State* v. *Smith,* supra, 548. The Supreme Court specifically stated that "[t]he outcome of the trial depended largely on the jury's assessments of the respective credibility of [the officer] and the defendant. . . . [T]he court's questions invited the jury to perceive the state's chief witness as someone to be respected and admired—a man who had endured hazardous duty, and eventual captivity, in the service of his country. The defendant, in contrast, was in police custody at the time of the incident and had a prior record of felony convictions. *In light of the circumstances,* it is impossible for us to agree with the state's conten-

tion that the trial court's unwarranted intervention was merely harmless error." (Emphasis added.) *State* v. *Smith*, supra, 550–51.[5]

The circumstances of the present case are very different from those that surrounded *Smith*. In the case at hand, the jury was presented with nineteen witnesses (twelve state's witnesses and seven defense witnesses) who testified at trial. Six eyewitnesses to the crime positively identified the defendant as the gunman. The defendant was not a stranger to the eyewitnesses. They each had known him socially for differing periods of time from one day to ten years. Four of the state's witnesses were the victims of the shooting. Each victim identified the defendant both in the emergency room and at trial in the jury's presence. See *State* v. *Mack*, 197 Conn. 629, 642–43, 500 A.2d 1303 (1985) (the court was convinced that the evidence of the guilt was overwhelming where the defendant was recognized during the course of the robbery by victims who knew him). In addition, the jury was aware that the defendant had twice admitted that he was the gunman. This clearly left the jury with more than a swearing contest between two witnesses when deciding credibility.

The final distinction between this case and the *Smith* case is that here, unlike *Smith*, the court specifically instructed the jury not to consider his or counsel's comments or conduct in reaching its decision.[6] *State* v. *Fer-*

---

[5] Although the defendant does not rely on *State* v. *Fernandez*, 198 Conn. 1, 501 A.2d 1195 (1985), in this portion of his argument, it is a case similar to the *Smith* decision. In *Fernandez*, the Supreme Court found that the trial court's questioning of a defense witness was impermissible because it tended to destroy his credibility in front of the jury. It should be noted that in *Fernandez* the witness questioned was also the *sole* defense witness.

[6] In its instructions to the jury, the court added the following. "Now, on occasion counsel get beyond the rules. So be it. That's not for you to be concerned with. Both may. You may not care for the way anyone functions—me or them. Put it aside. You have the accused and the interest of the state in your hands. That's the paramount concern. Put the rest aside. Understand that."

*nandez,* 198 Conn. 1, 17, 501 A.2d 1195 (1985); *State* v. *Jenkins,* supra, 44. Such curative instructions are entitled to great weight and ordinarily prevent an appellate court from finding that the trial court committed reversible error. *State* v. *Fernandez,* supra; *State* v. *Jenkins,* supra.

We are unable to hold that any of the instances highlighted by the defendant in this claim of error deprived him of a fair trial. Further, as to the defendant's claims that certain witnesses were bolstered by the judge, it must be remembered that these comments were never objected to in court and that the defendant never filed a motion for mistrial. *State* v. *Jenkins,* supra. As our Supreme Court has noted in the past, "[w]e are reluctant to award a new trial where those most concerned, better placed than we to assess the courtroom atmosphere, did not view the remarks to be so prejudicial as to warrant a new trial and preferred to stake the outcome on the trial under way." *State* v. *Mack,* supra, 642; see also *State* v. *Cosby,* 6 Conn. App. 164, 504 A.2d 1071 (1986).

Under the circumstances of this case, therefore, we hold that none of the trial court's comments deprived the defendant of his right to a fair trial or an impartial jury.

## II

The defendant next claims that the court erred in its refusal to admit the prior inconsistent statements of Jeannette Taylor, a victim of the shooting, and in its instructions to the jury concerning both Taylor's statements and the prior inconsistent statements of Joyner, another victim of the shooting. We will first review the admissibility of Taylor's statements, and then view the court's instructions concerning all of the claimed inconsistent statements.

## A

The defendant claims that he was harmed by the court's refusal to admit a written statement that was given to the police by Taylor shortly after the shooting. He asserts that contradictions between this statement and the victim's testimony on cross-examination undermined her credibility as a witness and that the court's refusal to admit the police statement into evidence allowed the jury to place undue emphasis on this victim's testimony.[7]

A trial court has wide discretion in allowing prior inconsistent statements to impeach the testimony of a witness. *State* v. *Torres,* 210 Conn. 631, 640, 556 A.2d 1013 (1989). Every reasonable presumption will be made in favor of the trial court's proper exercise of its discretion. *State* v. *Beckenbach,* 198 Conn. 43, 47, 501 A.2d 752 (1985).

In order for the claimed statements to be admissible, the court must first be persuaded that they are indeed inconsistent. *State* v. *Piskorski,* 177 Conn. 677, 710, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). An inconsistency must be substantial and relate to a material matter. Id. A witness cannot be impeached by contradicting his testimony as to collateral matters, that is, matters not material to the merits of the case. *State* v. *Wilson,* 158 Conn. 321, 324, 260 A.2d 571 (1969); 2 B. Holden & J. Daly, Connecticut Evidence (1988) § 125d (1), p. 1270.

---

[7] The defendant also claims that these statements should have been admitted under *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 96 L. Ed. 2d 598 (1986), holding that a witness' prior inconsistent statement may be used substantively, provided the statement is in writing, based on personal knowledge and the witness is available for cross-examination. He has overlooked, however, the fact that the statements must first fit the criteria of prior inconsistent statements, i.e., that they must be inconsistent and they must relate to a material matter.

When a witness admits making the statement, additional documentary evidence of inconsistency might be deemed to have been merely cumulative. *State* v. *McDowell,* 179 Conn. 121, 127, 425 A.2d 935 (1979). Thus, once a witness admits the inconsistency his credibility has already been called into question and there is no need for further proof of the inconsistency. *State* v. *Daskam,* 10 Conn. App. 50, 53, 521 A.2d 587, cert. denied, 203 Conn. 806, 525 A.2d 520 (1987). The right to confront and to cross-examine witnesses is essential to due process. To find a denial of due process there must be an absence of fairness that fatally infects the trial; the acts complained of must be of such quality as necessary to prevent a fair trial. *State* v. *Torres,* supra, 644–45.

The first contradiction between Taylor's written statement and her cross-examination testimony goes to whether she saw the defendant for the first time on the night of the shooting before she entered or as she exited building 14 of the P. T. Barnum Apartments. This meeting took place quite some time before the shooting. The exact moment of this encounter is of little consequence to the outcome of the case and fails to meet the requirement that the inconsistency be substantial and relate to a material matter.

The second inconsistency pointed to by the defendant goes to whether Taylor saw the defendant shoot "into the crowd" or "where the crowd was standing." We see little distinction, if any, between these two statements and therefore cannot find that they are inconsistent. Further, any inconsistency that may have existed in any of the above statements was *admitted* by the witness during the course of cross-examination, thus allowing the jury to weigh her credibility fairly. In addition, the allegedly inconsistent portions of Taylor's police statement *went before the jury* as defense exhibits three and four.

Viewing the testimony of Taylor in its entirety, we conclude that the trial court did not abuse its discretion in refusing to admit Taylor's written police statement as a full exhibit.

## B

The defendant next claims that the court erred in its instructions to the jury as to the inconsistent statements of both Taylor and Joyner.[8] The defendant asserts that the inconsistencies in Joyner's statements go to Joyner's location at the time he heard the shots, who was with him at that time, how he learned that his friend, Michael Barr, had been shot and whether he told the police that he saw the defendant run around the corner of building 19 after the shooting. Joyner also *admitted* any inconsistencies between his written statement and his testimony while he was on the stand, and the inconsistencies in his police statement *went before the jury* as defense exhibit five.

The defendant asserts that the jury should have been instructed that the factual content of the prior incon-

---

[8] The defendant also asserts that the judge urged the jury to discount the significance of omissions and inconsistencies in the eyewitness' testimony. To substantiate this claim the defendant directs our attention to a small portion of the court's charge to the jury. Even if we were to accept the defendant's interpretation of this excerpt, we could not ignore, as does the defendant, the fact that the court's remarks immediately preceding this passage define the term "inconsistent statement" and emphasizes its importance.

The trial court's instructions to the jury must be clear, accurate, complete and comprehensible. *State* v. *Kurvin,* 186 Conn. 555, 561, 442 A.2d 1327 (1982). We cannot view instructions in isolation from the overall charge. *State* v. *Reddick,* 197 Conn. 115, 132, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). "In reviewing the charge as a whole, the instructions 'need not be perfect, as long as they are legally correct, adapted to the issues and sufficient for the jury's guidance.' " *State* v. *Thurman,* 10 Conn. App. 302, 324, 523 A.2d 891, cert. denied, 204 Conn. 805, 528 A.2d 1152 (1987).

When the jury charge, as it pertains to this issue, is viewed in its entirety, we conclude that it was legally correct and was sufficient to guide the jury.

sistent statements of Taylor and Joyner could be used not only to weigh their credibility, but as substantive evidence in reaching their verdict. To support his claim, the defendant relies on the holding of *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The rule of *Whelan* is that prior inconsistent statements should be admitted to prove the truth of the matter asserted, provided that statement is a written statement, signed by a declarant who has personal knowledge of the facts stated, and the declarant testifies at trial and is subject to cross-examination. Id., 753. The defendant claims that the court's failure to instruct the jury properly on the use of the prior inconsistent statements deprived him of his best opportunity to discredit the state's witnesses and constitutes reversible error.

The court in the present case instructed the jury that "[e]vidence of statements made out of court, whether written or oral, inconsistent with testimony of a witness on the stand, is admitted not to prove the truth of the facts contained in any such statement so made out of court, but as evidence of conduct inconsistent with the testimony of the witness on the stand."

Because it is clear that the court did not instruct the jury in accordance with *Whelan,* we find error. "Error will warrant remedial action by this court only where it is harmful. . . . Harmful error requires a finding that the error was likely to affect the result. . . . It is the *appellant's burden* to demonstrate the harmfulness of the error"; (citations omitted; emphasis added) *Darling* v. *Waterford,* 7 Conn. App. 485, 488, 508 A.2d 839 (1986); where, as here, the claimed error does not involve, and the defendant does not assert, a constitutional violation. *State* v. *Sierra,* 213 Conn. 422, 436, 568 A.2d 448 (1990). The defendant has not met his burden in this case.

We conclude that, although the instructions were in error, they were clearly harmless because they did not affect the outcome of the trial. In the present case, "the evidence against the accused is so overwhelming that we can conclude as a matter of law that the jury's verdict was not influenced by the absence of a [*Whelan*] instruction"; *State* v. *Cohane,* 193 Conn. 474, 485, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); there is no error.

As noted above, six eyewitnesses positively identified the defendant as the gunman. The four victims identified Graham as their assailant both immediately after the incident and at trial. The defendant was known and readily recognizable to each of the eyewitnesses, and admitted to two of them that he was the shooter. The atomic absorption test done on the defendant's hands after the shooting showed that he had recently fired a gun. Finally, all of the alleged inconsistencies of both Taylor and Joyner were *admitted* at trial and the portions of the police statements bearing the inconsistencies went *before the jury as a full exhibit.*

In light of the above, the court's failure to give the *Whelan* instructions was harmless error.

### III

The defendant, who is black, further claims that his state and federal constitutional rights to equal protection and an impartial jury were violated when the state was allowed to use a peremptory challenge to exclude the only black venireperson based on impermissible bias. We are not convinced.

During the voir dire of prospective jurors, two panels, totaling twenty-one venirepersons, were questioned by the court, counsel for the defendant and the prosecutor. Of the twenty-one prospective jurors, seven were

excused by the court, four were excused by the defendant and three were challenged by the prosecutor. The only black venireperson presented to the court was the subject of a peremptory challenge by the prosecution. The defendant asserts that the prosecutor's actions were racially motivated.

From our review of the transcripts, it is evident that each venireperson was asked the same questions by the court, defense counsel or the prosecutor. After the prospective jurors were asked for general background information, they were each asked whether they had read about this case in the newspaper, whether they had any particular feelings about the area surrounding the P. T. Barnum Apartments or the people who live there, whether they had any specific positive or negative feelings about police officers, whether they had ever been the victim of a crime, whether evidence that a gun had been used would prejudice their conclusion of guilt or innocence and whether they could follow the judge's instructions.

Each of the eight persons chosen to be panelists answered these questions in a straightforward manner. The one black venireperson, who was the seventh person questioned, responded that she felt uncomfortable in the courtroom and felt she could not deal with the task before her. She expressed doubt, despite the court's reassurance to the contrary, that she would receive compensation from her employer while she was a juror. She also stated that she had negative feelings about the P. T. Barnum Apartments where the defendant and many of the witnesses lived, that her memory was bad, and that some people who deal in drugs or kill someone "get out too easy and go back to doing the same thing because they know they got it easy." Her most significant answers, however, indicated that

she felt that sitting on a jury was a waste of time,[9] and that she could not follow the judge's directions.[10]

After defense counsel and the court were finished questioning this venireperson, the state exercised a peremptory challenge to excuse her. The defendant immediately objected to the state's use of a peremptory challenge and argued that both the defendant and the venireperson were members of a cognizable group, that he recognized that peremptory challenges can be used for discriminatory purposes and that the woman had indicated that she would not be influenced by the defendant's race. He also requested that the court hold a hearing to determine the state's reasons for excusing this woman.

The court immediately asked the state to explain its reasons for the challenge and the prosecutor responded as follows:

"[It] just appears based on the answers, Your Honor, that the juror has indicated that she does not, at least as far as the state is concerned based on her answers,

---

[9] When defense counsel asked the prospective juror in question if she could think of any reason why she should not sit on this jury, her response was as follows: "I think it is a waste of time because, you know, like if someone do something wrong, you know, it should be between the lawyer and the judge and not pick people out to come in, you know, to give opinions about somebody else doing. And I just don't . . . ."

[10] The defendant's counsel presented a scenario to this prospective juror and then asked the following question and received the given response:

"Q. . . . Do you think that you would still be able to do what the judge said and vote not guilty despite what your emotions or your intuition may tell you? Would you be able to follow what the judge said?

"A. No.

"Q. Beg pardon?

"A. No.

"Q. If the judge told you that if the state has not put up evidence sufficient for a conviction that you must vote not guilty, and if you find that . . . . Did I confuse you just now?

"A. No."

the juror is not interested in being here. And the juror has expressed an indication that she feels that this is somewhat a waste of time.

"The state really is not interested in having someone on a jury who feels that way. I think it is an important function. It is an important civic duty, and if the juror does not wish to avail herself of her responsibility as a citizen in this community I think that the state is obligated to not allow that type of a person to sit on the jury.

"I think based on what she said and based on the entire responses it is clear at least to the state that she is not interested in serving. The state is looking for a disinterested juror, not an uninterested juror. In this state's opinion this prospective juror is not interested in serving."

The court accepted this reasoning and excused the juror. The defendant then moved to strike the jury panel, not on equal protection grounds as claimed on appeal, but on the claim that the jury failed to represent a fair cross section of the community.[11]

Recently, the United States Supreme Court, in *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), held that the discriminatory use of a peremptory challenge in a single case violates the equal protection clause. See also *State* v. *Tappin,* 20 Conn. App. 241, 246, 566 A.2d 709 (1989).

In order to establish a claim of racially motivated peremptory challenges under *Batson,* a criminal defend-

[11] The defendant restated his claim that the jury did not represent a fair cross section of the community a second time when he asked the court to strike the entire second panel of prospective jurors presented to the court. This, however, does not fall within the realm of the *Batson* claim asserted by the defendant on appeal. *Batson* applies to the impaneling of a petit jury, while an objection to the "fair cross section of the jury" implicates the method by which the venire summons jurors from the community.

ant bears the burden of establishing, by a preponderance of the evidence, that the state's use of the peremptory challenge was tainted by purposeful discrimination. *Batson* v. *Kentucky,* supra, 94 n.18; see also *State* v. *Holloway,* 209 Conn. 636, 646, 553 A.2d 156 (1989). The defendant must produce evidence that "he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson* v. *Kentucky,* supra, 96.

Once a defendant successfully makes a prima facie showing that the state acted with the intent to discriminate, the state must then provide the court "with a prima facie case response"; *State* v. *Holloway,* supra; articulating a neutral explanation for excusing members of the defendant's racial group. *Batson* v. *Kentucky,* supra. After the state has presented its reasons for the challenge, the defendant is given the opportunity to demonstrate that the reasons are insufficient or pretextual. *State* v. *Holloway,* supra, 641.

After hearing this evidence, the trial court must determine whether the defendant has carried his burden of showing purposeful discrimination. Because " ' "the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility . . . a trial court's determination that there has

or has not been intentional discrimination is 'entitled to appropriate deference' upon review on appeal." ' " (Citations omitted.) Id.

In the present case, the first *Batson* requirement was fulfilled. The defendant was a member of a racially cognizable group. He preserved his right to challenge the removal of the sole black venireperson from his jury by his timely objection to her dismissal. Further, the court impliedly ruled that the defendant had raised a reasonable question of discrimination when the judge asked the prosecutor to articulate neutral reasons for his challenge. See *State* v. *Gonzalez,* 206 Conn. 391, 397, 538 A.2d 210 (1988).

The second *Batson* requirement was also met. When asked by the court to explain his use of the challenge, the prosecutor noted that, taken as a whole, the venireperson responses indicated that she was not interested in being a juror and consequently she would have been ineffective in that capacity. The record clearly supports the prosecutor's claims. See footnotes 10 and 11, supra.

The defendant, however, responded to the prosecutor's arguments by merely stating that he wanted to have the entire jury struck without disputing the substance of the state's articulated reasons. This statement failed to show that the state's reasons for exercising this peremptory challenge were pretextual. Moreover, a defendant cannot be permitted to request that the jurors thus far selected be dismissed until after he has shown, by a preponderance of the evidence, that the prosecutor's reasons for dismissing the juror were pretextual and, but for the prosecutor's invidious purpose, the juror would not have been challenged. See *State* v. *Gonzalez,* supra, 399–400.

The court's decision to dismiss this venireperson is clearly supported by the record before us. We conclude

that the court did not err in determining that the state's exercise of the peremptory challenge in question was not racially motivated and was without a discriminatory purpose. Moreover, the exclusion of this venireperson did not violate the defendant's state or federal constitutional rights.

## IV

The defendant next claims that the court erred in its instruction on eyewitness identifications when it failed to cover all the salient points requested by the defendant.

It is not error when a trial court refuses to charge a jury in the exact words of a requested instruction, as long as the requested charge is given in substance. *State* v. *Fenn,* 16 Conn. App. 318, 328, 547 A.2d 576, cert. denied, 209 Conn. 822, 551 A.2d 757 (1988), cert. denied, 488 U.S. 1031, 109 S. Ct. 841, 102 L. Ed. 2d 973 (1989).

The defendant requested that the court's instructions to the jury on eyewitness identification include a consideration of (1) whether the witness had the capacity and an adequate opportunity to observe the offender, (2) whether the identification was the product of the witness' own recollection and if so to consider the strength of the identification and the circumstances under which the identification was made, (3) whether the witness had failed to identify the defendant on any occasion, and (4) whether the witness was credible. Although he has not cited the specific case, the defendant's requested instructions on the dangers of eyewitness identification testimony are essentially those found in *United States* v. *Telfaire,* 469 F.2d 552 (D.C. Cir. 1972).[12]

---

[12] Under *United States* v. *Telfaire,* 469 F.2d 552, 558–59 (D. C. Cir. 1972), the jury should be instructed to consider the following: (1) the adequacy of the witness' opportunity and capacity to observe the offender; (2) the

Our review of the record indicates that although the court's charge to the jury did not mirror the defendant's request to charge, it did cover the substantive points requested by him. Further, in examining the charge as a whole, these instructions were clear, accurate, complete, comprehensive, and furnished sufficient guidance to the jury. See *State* v. *Hardison,* 16 Conn. App. 142, 146, 546 A.2d 968 (1988).

The court did not err in its refusal to give a *Telfaire* instruction because the " 'salient principles of the court's charge adequately covered the dangers of misidentification.' " Id., 147, quoting *State* v. *McKnight,* 191 Conn. 564, 583, 469 A.2d 397 (1983).

V

The defendant next claims that the court erred in refusing to give a *Secondino,*[13] or missing witness, charge to the jury when the state failed to call Officers Willie Samuels and James Sheffield of the Bridgeport police department as witnesses.

"A negative inference may be drawn if a party fails to produce a witness who (1) is within his power to produce, and (2) would naturally have been produced by him. . . . 'A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce.' . . . A prospective witness whose testimony would be com-

---

length of time available for the witness to observe the offender; (3) the proximity of the witness to the offender; (4) whether the person had seen or known this person in the past; (5) whether the identification was a product of the witness' own recollection; and (6) the credibility of the witness. See *State* v. *Hardison,* 16 Conn. App. 142, 146 n.4, 546 A.2d 968 (1988).

[13] *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960).

paratively unimportant, cumulative or inferior to what has been offered, should be dispensed with on the grounds of expense and inconvenience, without the need for an adverse inference charge." (Citations omitted.) *State* v. *Williams,* 20 Conn. App. 263, 266, 565 A.2d 1365 (1989).

"When a witness is equally available to both parties no inference unfavorable to either may be drawn. . . . It is plain that naturalness of production and materiality are not the same." (Citations omitted.) *State* v. *Brown,* 169 Conn. 692, 705, 364 A.2d 186 (1975); see also *State* v. *Scott,* 20 Conn. App. 513, 520, 563 A.2d 1048 (1990).

The witnesses' availability is a fact to be shown by the defendant since he is the party to be benefited. *State* v. *Messier,* 16 Conn. App. 455, 466, 549 A.2d 270, cert. denied, 209 Conn. 829, 552 A.2d 1216 (1988). Although the defendant argues that both officers took statements from the victims at the hospital and were available to the state, the prosecution claims that there is insufficient proof as to the existence of Samuels. The only proof as to the existence of this officer is Taylor's testimony that she was interviewed at the hospital by a black officer named Samuels.

Even if we were to assume, as the defendant contends, that both officers were available at the time of trial the defendant's claim still must fail. The testimony of these officers would have been merely cumulative. Their claimed role in the investigation was only to interview some of the victims at the hospital after the shooting. Not only did the victims themselves testify as to the statements and identifications they made at the hospital, but the detective in charge of the investigation, Carl Leonzi, also testified at great length as to this phase of the investigation.

It must also be noted that the officers in question · were available to both parties. The record shows that the defendant subpoenaed Sheffield and that he was present and ready to testify during the trial and that during defense counsel's preparation for the trial he spoke to Samuels. The record also shows that defense counsel admitted to the court that he had decided not to call either of these witnesses because it would not have been profitable for the defense. Because the defendant made no effort to call these witnesses to the stand we have no choice but to conclude that this decision was made as part of a defense trial strategy, and that he cannot now claim that their absence warranted a *Secondino* charge.

## VI

The defendant's final claim is that the court erred in denying him the opportunity to voir dire Peter Small, an ophthalmologist who testified as an expert witness as to the injuries sustained by Michael Barr as a result of the shooting. Specifically, the defendant claims that with Small's testimony as to whether he had specific medical experience with the injury involved in this case, whether he had ever been suspended from practice and whether he had any interest in the case, the jury would not have concluded that the injury was serious enough to warrant a conviction for first degree assault.

General Statutes § 53a-59 (a) (1) provides that "[a] person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ." Serious physical injury is defined in General Statutes § 53a-3 (4) as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ."

Whether Barr suffered a "serious physical injury" was a question of fact for the jury. *State* v. *Miller,* 202 Conn. 463, 489, 522 A.2d 249 (1987). "In reviewing the sufficiency of the evidence concerning this element of assault in the first degree, our task is to construe the evidence in the light most favorable to sustaining the jury's verdict, and then to determine whether any rational trier of fact could have found that the harm suffered rose to the level of a 'serious physical injury' under the statute. . . . We cannot substitute our judgment for that of the jury." (Citations omitted.) Id.

There was evidence before the jury that Barr was shot in the face and shoulder and can no longer see out of his left eye. In light of the evidence presented, we cannot say, as a matter of law, that the questions proposed by the defendant on appeal could have led the jury to believe that Barr's injuries were not serious.

There is no error.

In this opinion the other judges concurred.